*In re* K.T. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. B.T., Respondent-Appellant).

First District (6th Division) No. 1—05—0638

Opinion filed September 23, 2005.

S. Michael Kozubek, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James Fitzgerald, Nancy Faulls, and Nicole M. Torrado, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Robert F. Harris, Kass A. Plain, and Jean M. Agathen, of counsel), guardian *ad litem*.

JUSTICE FITZGERALD SMITH delivered the opinion of the court:

At an adjudicatory hearing, the circuit court found respondent Bernice T.'s children Lateasha, Derrick, Devon, Isiah, Takyrah and Amarion were neglected due to exposure to an injurious environment and abused based on substantial risk of physical injury. At a subsequent dispositional hearing, the court ruled that respondent was unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the children, and all six minors were made wards of the court and placed in the custody of the Department of Children and Family Services (DCFS).

Respondent now appeals, contending (1) the adjudication of abuse and neglect was based on the erroneous admission of psychiatric evidence of factitious disorder by proxy; (2) the State failed to establish neglect or abuse through respondent's alleged actions, rather than her alleged mental condition; (3) the State failed to prove anticipatory neglect to respondent's remaining children; and (4) the trial court's finding that respondent was unable, for some reason other than financial circumstances alone, to care for her children was against the manifest weight of the evidence. For the reasons that follow, we affirm the trial court's adjudicatory and dispositional hearing orders.

## BACKGROUND

Bernice T. has seven children: Lateasha was born in 1991, Derrick was born in 1993, Devon was born in 1994, Isiah was born in 1995, Takyrah was born in 1998, Khayla was born in 2000, and Amarion was born in 2002.

In December 2000, a caller to the DCFS hot line reported that Khayla was hospitalized for a second time suffering from nonorganic failure to thrive. The court granted DCFS temporary custody of Khayla and, in August 2001, adjudicated her abused or neglected due to a lack of necessary care and an injurious environment based of her nonorganic failure to thrive. On December 3, 2001, the court made Khayla a ward of the court, found both respondent and Khayla's father unable to care for Khayla, and subsequently placed her in a nonrelative foster placement.[1]

In November 2001, Dr. Kim Dell'Angela, an assistant professor at Loyola University's Stritch School of Medicine and a licensed clinical psychologist, submitted an independent case evaluation and concluded that respondent suffered from factitious disorder by proxy, which caused her to commit acts of child maltreatment. Following a December 2001 temporary custody hearing for Lateasha, Derrick, Devon, Isiah and Takyrah, the court found probable cause that the five children were neglected but allowed them to remain in the home with additional services offered to respondent and monitoring of the home. The court's orders of protection required respondent to, *inter alia*, participate in a parenting capacity and neuro-psycho-social assessment and follow all recommendations of same, cooperate with assessments of the children's special needs, attend counseling and follow all recommendations of same, engage in individual psychotherapy, and coordinate all the children's medical care through the University of Illinois in Chicago (UIC) only. Accordingly, respondent was referred to Dr. Paul Linden, a licensed clinical psychologist, for a complete psychological evaluation. Dr. Linden recommended that the children be removed from respondent's care because of her diagnosis of factitious disorder by proxy, her borderline intellectual functioning and her avoidant personality disorder which included borderline features.

After a January 2002 temporary custody hearing for the five children, the court found that it was a matter of urgent and immediate necessity to remove the children from respondent's custody and

---

[1]On the motion of the Public Guardian, this court on May 12, 2005, dismissed respondent's appeal solely as to Khayla for lack of jurisdiction where respondent did not appeal the December 2001 ruling concerning Khayla until March 2005.

granted temporary custody of the children to DCFS. After Amarion's birth in December 2002, a temporary custody hearing was held for him in January 2003. The court found probable cause that he was abused or neglected, removed him from the home and granted temporary custody of Amarion to DCFS.

## Adjudication Hearing

The hearing on the State's petitions for adjudication of wardship for the six children commenced in July 2003 and continued over numerous dates to September 1, 2004, when the court issued its rulings. The trial court took judicial notice of the 2001 juvenile court finding that adjudicated Khayla neglected due to a lack of necessary care and an injurious environment on the basis of her diagnosis of nonorganic failure to thrive. Further, the court admitted into evidence Dr. Dell'Angela's 2001 report. DCFS consulted Dr. Dell'Angela prior to Khayla's dispositional hearing to assess the allegation and risk related to Munchausen syndrome by proxy (MSBP). Although DCFS failed to provide Dr. Dell'Angela with all the requested medical records and documentation, Dr. Dell'Angela obtained a large amount of the documentation from the children's treating physician, Dr. Monte Hetland. Dr. Dell'Angela also had conversations with respondent, the children's treating physicians and caseworkers to get information or clarify her impressions.

Dr. Dell'Angela noted that respondent reported to physicians several medical diagnoses or treatments that were not substantiated by the children's medical records or the direct observations and assessment of medical personnel. These unsubstantiated conditions included: seizure disorder for Isiah; seizure disorder and asthma for Lateasha; bloody vomiting, seizure disorder, diabetes, brain tumor and complications from cyst removal, and a cardiac defect requiring medication for Derrick; and asthma for Devon. In contrast to respondent's claims about her children, Dr. Hetland reported to Dr. Dell'Angela that, apart from Takyrah's multiple problems due to her cerebral palsy, the only other problems suffered by the other children as of November 2001 were behavioral and conduct problems, and poor dentition.

Dr. Dell'Angela stated that MSBP was not a psychiatric diagnosis but a description of a pattern of behavior that constitutes child abuse. Dr. Dell'Angela concluded that there was clear evidence that respondent perpetrated child maltreatment, respondent's documented misrepresentations were not due to psychosis or delusional disorder, and respondent's cognitive limitations were not the primary cause of the misrepresentations. Dr. Dell'Angela recommended strongly that the children be removed from respondent's care.

The trial court also admitted into evidence a 2001 psychological evaluation of respondent prepared by Dr. Paul Linden, a clinical psychologist. Dr. Linden reviewed Dr. Dell'Angela's report and other prior psychological evaluations and court records. Dr. Linden then summarized the results of 11 tests and the clinical interview he conducted with respondent. Dr. Linden assessed respondent's full scale IQ at 72, which was in the borderline to mild mentally retarded range. Respondent showed moderate deficits in her attention, concentration and memory, and mild deficits in her receptive and expressive language and basic cognitive skills. Respondent functioned at a fourth-grade level. Dr. Linden noted that the results of personality testing provided reason for concern about respondent's ability to parent her children and were not inconsistent with a diagnosis of MSBP. The children were not doing well in respondent's care. Derrick and Isiah had severe emotional and behavioral problems and were on psychotropic medication and not in traditional schools. Takyrah's brain damage, three months after a normal delivery, left her unable to use her arms or legs effectively, unable to see, and dependent on G-tube feedings. Khayla was diagnosed with failure to thrive and was anemic and severely underweight when taken into custody. Dr. Linden recommended that the children be removed from respondent's care and respondent referred to therapy.

Four witnesses testified at the adjudication hearing: Dr. Laura Miller, the psychiatrist who headed the UIC parenting assessment team (PAT) that evaluated respondent's parenting capabilities; Dr. Monte Hetland and Dr. Miriam Kalichman, two pediatricians who treated the children; and Dr. Robert Galatzer-Levy, a child and adolescent psychiatrist.

The parties stipulated that Dr. Hetland, a pediatrician and assistant professor of clinical pediatrics at UIC, was an expert in pediatrics, and the court found him qualified to give a diagnosis of failure to thrive. In June 2000, he became the treating physician for the children, with the exception of Takyrah, whose neurological problems necessitated treatment by Dr. Kalichman. Dr. Hetland testified that Khayla was born at Cook County Hospital three months premature in February 2000 and suffered from respiratory distress syndrome, unknown maternal hepatitis B status, hyperglycemia, apnea and cyanosis, and oral thrush. Khayla was discharged from the hospital in April 2000, and her medical problems were resolved by her first follow-up appointment in May 2000. In June 2000, Khayla was admitted to Holy Cross Hospital when respondent reported that Khayla hit her head in an accident. After an ultrasound revealed that Khayla was fine, respondent requested that Khayla be transferred to

UIC and claimed that a UIC hematologist had seen Khayla. After Khayla was admitted to the UIC hospital, respondent told a doctor that Khayla had diabetes, received oxygen at home, and received insulin shots twice a week from a home health care nurse named Shirley. The hospital investigated this claim, determined that it was false, and confronted respondent, who then denied ever stating that Khayla was diabetic. Respondent also claimed that Khayla suffered from hemophilia, but test results refuted that claim. Khayla did have anemia and was given transfusions of packed red blood cells to treat that condition. Respondent's allegation about hemophilia, however, delayed Khayla's hernia operation and increased the risk of injury to Khayla's bowel.

Dr. Hetland testified that in October 2000, Khayla was hospitalized at UIC again because she failed to gain the appropriate weight while under respondent's care. The appropriate weight gain should have been approximately one ounce per day, but Khayla gained only seven ounces in one month. While Khayla was in the hospital, the doctors were satisfied with her growth.

Dr. Hetland again admitted Khayla to UIC hospital in December 2000 for failure to gain weight. An MRI proved that Khayla did not have any brain damage and ruled that out as a possible cause of her failure to gain weight. Although Khayla did have other problems at various times—gastroenteritis, "RSV," reactive airway disease, and anemia—all those conditions were ruled out as the cause of her failure to thrive. Dr. Hetland diagnosed Khayla with nonorganic failure to thrive. Although Khayla lost weight on certain days when she was hospitalized, her overall weight improved every time she was hospitalized. On one occasion, respondent gave Dr. Hetland a record of what she claimed she fed Khayla at home. Dr. Hetland, however, determined that Khayla would have been substantially bigger if respondent actually fed Khayla the recorded amount of food.

Over respondent's objection, the trial court admitted into evidence the PAT report, a 132-page report prepared by the clinical team at UIC to assist DCFS and the juvenile court in evaluating the ability of mentally ill individuals to parent their children. The PAT conducted a large number of assessments, including interviews of collateral sources. The PAT completed an evaluation of respondent and produced a report that summarized the various assessments done and the conclusions reached, and included respondent's psychological evaluation, parenting competency evaluation and various appendices. One appendix included a detailed chart of the medical records of Khayla, Takyrah and Derrick.

The PAT report summarized DCFS's investigative records regard-

ing the family and noted that respondent was indicated for child neglect five times. In 1996, 18-month-old Isiah was admitted to the hospital for a near fatal overdose of Dilantin and had to have his stomach pumped. Respondent gave medical staff several different accounts of how it happened. In June 2000, Dr. Kalichman reported that respondent might be psychotic or have MSBP because she was giving medical staff inaccurate information about her children. Specifically, respondent reported that Khayla had hemophilia and diabetes, but testing showed that she had neither condition. Respondent also reported that Derrick had hemophilia, diabetes, seizure disorder, a heart defect, and a previous brain tumor, but testing showed that he had none of those conditions. In addition, DCFS received two reports in 2000 when Khayla was hospitalized for failure to gain weight and nonorganic failure to thrive.

The PAT report found that respondent's behavior was consistent with factitious disorder by proxy, a proposed diagnosis with specific criteria currently being researched, in which a caregiver produces and/or feigns symptoms in the victim, usually to receive attention and affirmation. Respondent did not appear to be delusional about her children's medical conditions because she readily changed her story when confronted with evidence refuting her claims. Furthermore, despite her mild mental retardation, she provided detailed and accurate explanations of the diagnoses she incorrectly attributed to her children. Consequently, it did not appear that her incorrect reports were due to a misunderstanding of the medical terminology she was using. In addition, respondent was calm and unemotional while discussing claims of such catastrophic medical conditions in her children, which was highly characteristic of factitious disorder by proxy.

The PAT report noted the following specific types of harm respondent caused in her children: Khayla's hernia operation was delayed when respondent falsely reported that Khayla had hemophilia; respondent gave incorrect doses of medication, once causing a potentially fatal overdose of Dilantin to Isiah; Khayla received inadequate nutrition, leading to failure to thrive; Derrick and Lateasha received unnecessary medications such as Digoxin and Dilantin; and Khayla and Derrick underwent multiple unnecessary, painful and frightening tests that included blood draws, CT scans and EEGs.

The PAT examined the medical records to determine whether respondent gave false information to medical professionals or caused any symptoms in her children. The PAT then created a summary chart, contained in an appendix, that focused on Derrick, Takyrah and Khayla, identified the source and date of the medical information and commented on the information.

Specifically, respondent reported to UIC that Derrick had a brain tumor, a brain cyst removed, a heart defect, and regular seizures twice a week. Respondent claimed Derrick vomited blood, bled from his eyes when he cried, and that blood taken from his arm looked like water. Although respondent claimed Derrick received home-bound school services because his seizures frightened his teachers, the teachers informed the PAT that Derrick was not known to have any seizures. Furthermore, Derrick's medical records refuted respondent's claims regarding surgery, tumors, or cysts, and Derrick's EEG revealed no evidence that he had epileptic seizures.

Takyrah was essentially a normal, healthy baby although she was born a few weeks premature in July 1998. At about three months of age, she was hospitalized after respondent called an ambulance about three hours after she reportedly found Takyrah blue and not breathing. Takyrah was in hypoxic shock due to lack of oxygen and seizing about once a minute. Respondent falsely informed medical staff that Takyrah was ventilated several days after her birth. When Takyrah was discharged from the hospital, respondent was given instructions to follow up with occupational and physical therapies at the hospital but no records indicated that Takyrah received that follow-up care. Furthermore, respondent falsely reported to school personnel that Takyrah could not hear and was scheduled for brain and heart surgery. In March 1999, Takyrah was admitted to the hospital for failure to thrive and again referred for physical and occupational therapy, and neurological appointments, but respondent failed to keep appointments for those services.

Respondent gave detailed false information to professionals at two hospitals about Khayla's alleged treatment for diabetes and hemophilia, which resulted in Khayla undergoing painful and unnecessary tests to rule out those conditions. Respondent also gave inaccurate information about Khayla's feedings at home.

The PAT then consulted Drs. Hetland and Kalichman to ensure that the interpretations of the record were accurate. The results of the process substantiated respondent's diagnosis of factitious disorder by proxy where she repeatedly reported false information to the current hospital regarding alleged findings of medical conditions or treatment from other hospitals, gave the children unnecessary medication and did not follow medical orders in giving medication, and did not follow up well once she engaged with medical professionals.

The parties stipulated that Dr. Miller was an expert in psychiatry. She was a psychiatrist on the PAT in this matter, interviewed respondent for 1 hour and 40 minutes and reviewed voluminous records, including the children's medical records, psychological evalua-

tions of respondent, DCFS case entries, client service plan narratives and therapy reports. Dr. Miller opined to a reasonable degree of medical certainty that respondent suffered from mild mental retardation and a research criteria set called factitious disorder by proxy. Respondent's mild mental retardation impacted her cognitive functions. Dr. Miller also explained that a person who suffered from factitious disorder by proxy induced or feigned physical symptoms in a person under her care and did so for emotional reasons, not financial gain. In some cases, the caregiver with the disorder truly believed that the person under her care had the reported symptoms; however, in reality the person never showed the symptoms. Dr. Miller explained that factitious disorder by proxy, which was earlier known as MSBP, was a recognized diagnosis by the American Psychiatric Association but was a research criteria diagnosis instead of a formal diagnosis. Although it had undergone a certain level of research, more research was needed before it could appear in the body of the diagnostic manual, rather than in the appendix. Researchers had not yet developed a specific profile of a person suffering from factitious disorder by proxy because there was disagreement among the researchers as to what symptoms indicated the disorder.

Dr. Miller testified that respondent had a history of repeatedly reporting to health professionals symptoms and medical illnesses that were not objectively verified and incongruent with medical examinations and medical records. Dr. Miller determined that respondent's false reporting of medical symptoms was not based on simple misunderstandings, noting that respondent provided detailed and accurate explanations of the incorrect diagnoses she attributed to her children. Dr. Miller stated that respondent's false reports put her children at risk of physical harm. For example, when respondent insisted that one child had hemophilia, the child had to undergo two unnecessary blood draws that caused her to become anemic. Dr. Miller also explained that children continuously undergoing unnecessary medical treatments were at risk of emotional harm because their sense of reality about what was happening to their bodies was negated by a parent. Dr. Miller explained that this emotional dilemma caused behavioral disturbances in children.

Dr. Kalichman, a UIC pediatric specialist for chronic disease and developmental delays, testified as Takyrah's outpatient treating doctor. Takyrah's severe disabilities included extensive brain damage that manifested itself as spastic quadriplegia, cerebral palsy, seizure disorder, microcephaly, profound developmental cortical blindness and the inability to swallow adequately. Dr. Kalichman was concerned about the care Takyrah received from respondent. Specifically,

respondent reported that Takyrah was receiving two injections of a stimulant hormone every day for 14 months, but Takyrah had no signs of excess steroids in her body, no needle marks, and no areas where her muscles were thick or swollen from repeated injections. Respondent also reported that Takyrah received a dose of a particular medication that was 10 times the usual dose, and reported several different doses of different anticonvulsants. Further, respondent's report of Takyrah's feeding history was obviously false given Takyrah's actual weight. In addition, respondent claimed that she was pregnant with twins because she had a special stethoscope that made it possible for her to hear two heart beats. Respondent, however, had not had any prenatal care to substantiate that claim.

Dr. Kalichman was also concerned about respondent's reports of her children's medical conditions. Dr. Kalichman had the opportunity to examine Derrick in January 2000. While discussing Derrick's medical history with respondent, she claimed that Derrick suffered from hemophilia. When Derrick was subsequently tested, the tests revealed that he did not have hemophilia despite slightly abnormal test results. Dr. Kalichman reviewed Derrick's records after seeing him and discussed him with other medical professionals because respondent's report of his history was inconsistent with his physical exam and did not make sense.

Dr. Kalichman also saw Khayla in June 2000, and respondent claimed that Khayla suffered from hemophilia. Numerous tests were performed on Khayla and revealed that she did not have hemophilia. Respondent also claimed that Khayla had diabetes and a home health care nurse named Shirley gave Khayla insulin shots at home. Dr. Kalichman, however, contacted the home health care service and learned that it was not providing any services to Khayla. Moreover, test results proved that Khayla did not suffer from diabetes. Khayla did suffer from a hernia that needed surgery, but respondent's claims about Khayla's medical history led to further testing that delayed the hernia surgery and put Khayla at risk of having the hernia interfere with her bowel. Dr. Kalichman told medical professionals caring for Khayla to be circumspect because she doubted the veracity of respondent's statements.

Respondent moved into evidence certain medical records and her November 2002 therapy report from Dr. Traci Powell. Dr. Powell reported that respondent had attended therapy since March 2002. Dr. Powell did not find any evidence to support the diagnosis of factitious disorder by proxy. Dr. Powell believed respondent had great difficulty in processing and expressing information, which could have been the impetus for the numerous doctor and medical visits for her children.

In a March 2004 therapy report, Dr. Powell did not diagnose respondent with factitious disorder by proxy.

Dr. Galatzer-Levy was qualified as an expert in child and adolescent psychiatry. He reviewed the children's medical records, a document from a funeral home regarding a stillborn baby, Dr. Miller's psychiatric evaluation of respondent, Dr. Linden's psychological evaluation report, and the transcript of prior hearings. Dr. Galatzer-Levy never examined respondent or the children and never saw portions of the PAT report, particularly the appendix that summarized the medical records of Derrick, Takyrah and Khayla. Dr. Galatzer-Levy determined that respondent did not suffer from factitious disorder by proxy. A more likely explanation was that respondent had several extremely ill children, was not well educated, was at a borderline intellectual level, was very concerned about her children, and reported their conditions in a manner that troubled or upset physicians who responded to a nagging parent by saying that she falsely reported the illnesses. Dr. Galatzer-Levy opined that Khayla's failure to thrive was not due to respondent's failure to care for Khayla, but rather was caused by some other undisclosed reason. However, Dr. Galatzer-Levy had concerns regarding respondent's parenting ability and stated that respondent did not fully understand her children's medical conditions and was not able to report to the doctors in an effective way. Dr. Galatzer-Levy did not have sufficient information to form an opinion about whether respondent could provide the necessary care for her children despite her limitations.

At the conclusion of the hearing, the court entered an order finding that Lateasha, Derrick, Devon, Isiah, Takyrah and Amarion were neglected based on an injurious environment and abused based on a substantial risk of physical harm. The court acknowledged that factitious disorder by proxy was not yet identified as a psychiatric illness but determined that respondent's conduct toward the minors constituted abuse and neglect. Specifically, the court noted Drs. Miller, Kalichman and Hetland testified regarding how respondent presented the children at UIC for treatment and the PAT report listed respondent's inaccurate reports of her children's symptoms and medical conditions from 1996 to 2003. The PAT concluded that respondent's inaccurate reports to medical staff caused the children to undergo unnecessary medical procedures, take unnecessary medication, and even delayed a necessary surgery. The court found the PAT's conclusions were based on a thorough investigation by professionals who examined the medical records, interviewed the parents and went outside the record to try to corroborate or refute the conclusions of Drs. Kalichman and Hetland. Further, the reports of Drs. Dell'Angela and Linden

opined that respondent displayed characteristics of factitious disorder by proxy and concluded that her children were at risk in her care.

The court stated that Dr. Galatzer-Levy looked at certain medical records for hints to connect respondent's inaccurate reports to actual, but misunderstood, medical conditions or symptoms. The court found, however, that Dr. Galatzer-Levy did not discredit the PAT, never interviewed the parents, and did not review the entire PAT report, especially the "clear" and "compelling" appendix summary of the medical histories of Derrick, Takyrah and Khayla. Although Dr. Galatzer-Levy opined that respondent's conduct was not characteristic of factitious disorder by proxy, he testified that respondent could not fully understand and effectively report her children's medical conditions. The court found that respondent's behavior, which was consistent with factitious disorder by proxy, did exist. But even absent a factitious disorder by proxy diagnosis, Khayla was previously adjudicated abused or neglected and the evidence established that similar conduct affected Takyrah and Derrick.

The case then proceeded to a disposition hearing on February 10, 2005, to determine whether it was in the best interests of the minors that they be made wards of the court. Dr. Traci Powell, respondent's treating psychiatrist since March 2002, was qualified as an expert in the field of psychiatry. During therapy, Dr. Powell found that respondent often answered questions in a way that could be misunderstood. Testing reinforced Dr. Powell's belief that respondent's limited intellectual ability interfered with previous test results and presented itself as factitious disorder by proxy. Consequently, Dr. Powell dropped factitious disorder by proxy from respondent's diagnosis of adjustment disorder with depressed mood. Dr. Powell thought the PAT relied too heavily on record review and never interviewed either Dr. Powell or her supervisor. Dr. Powell stated that she never treated any patient with factitious disorder by proxy and never observed respondent interact with her children. Respondent had improved with therapy and would not be a threat to her children in unsupervised day visits. Due to her cognitive limitations, respondent did not comply with the children's ongoing medical needs and appointments and was not able to care for them by herself. To care for the children, respondent would need a great deal of outside help due to her cognitive limitations and the number of children, two of whom had special needs.

Tracy Harris, the social worker who oversaw Takyrah's placement, testified that Takyrah was in a specialized foster home due to her cerebral palsy, blindness, seizure disorder and G-tube feeding. She received services at school, including physical, speech and occupational

therapy. Harris observed one visit between respondent and Takyrah and noted a bond and positive interaction.

Jenny Blazejewski, the social worker for the rest of the children, testified regarding reunification services and summarized the progress and status of Lateasha, Derrick, Devon, Isiah, Khayla and Amarion. Blazejewski recommended that all the children be made wards of the court except Derrick, who should remain with his father and whose case should be closed. Blazejewski testified that respondent's visits with the children went very well, but respondent needed therapy, family counseling, a new psychological evaluation and homemaker services.

The court admitted into evidence an updated report by Dr. Galatzer-Levy. This report incorporated information from the PAT report, additional medical records, and respondent's evaluations and therapy reports. Dr. Galatzer-Levy concluded that respondent did not have factitious disorder by proxy and the evaluations that resulted in such a diagnosis were unsatisfactory because certain medical records were ignored or missing.

The trial court found respondent unable for some reason other than financial circumstances alone to care for her children and that becoming wards of the court was in the children's best interests.[2] Respondent appealed.

## ANALYSIS

Following the filing of a petition for wardship by the State and the placement of a child in temporary custody, the circuit court conducts an adjudicatory hearing to determine whether the allegations of the petition that a minor is abused, neglected or dependent are supported by a preponderance of the evidence. 705 ILCS 405/1—3(1), 2—21 (West 2002). Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not. *In re K.G.*, 288 Ill. App. 3d 728, 735 (1997).

A neglected minor includes any minor under 18 years of age whose environment is injurious to his or her welfare. 705 ILCS 405/2—3(1)(b) (West 2002). Neglect is defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty. *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). The term is not one of fixed and measured meaning, and it takes its content from the specific circumstances of each case. *In re Arthur H.*, 212 Ill. 2d at 463. An injurious environment is an amorphous concept that cannot be defined with particularity but

---

[2]The court found Derrick's biological father fit, able and willing to care for Derrick and ordered that Derrick remain in his father's custody.

has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. *In re Arthur H.*, 212 Ill. 2d at 463.

■ An abused minor includes any minor under 18 years of age whose parent creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function. 705 ILCS 405/2—3(2)(ii) (West 2002). Specific intent to hurt the child does not need to be established to prove abuse. *In re F.S.*, 347 Ill. App. 3d 55, 63 (2004). Cases involving abuse, neglect and wardship are *sui generis*; each case must be decided on its own distinct set of facts and circumstances. *In re J.P.*, 294 Ill. App. 3d 991, 1002 (1998).

■ The best interest of the child is the paramount consideration whenever a petition for adjudication of wardship or any proceeding is brought under the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 2002)). *In re K.G.*, 288 Ill. App. 3d at 734-35. At the adjudicatory stage, the court must focus solely on whether the child has been neglected or abused, not upon whether the parents were neglectful or abusive. 705 ILCS 405/1—3(1) (West 2002); see *In re Arthur H.*, 212 Ill. 2d at 465.

If the State satisfies its burden of proof, the circuit court proceeds to a disposition hearing to determine whether it is consistent with the health, safety and best interests of the minor and the public to make the minor a ward of the court, and to determine what order of disposition should be made in respect to the minor so adjudged. 705 ILCS 405/1—3(6), 2—22 (West 2002).

A trial court's finding of abuse or neglect is entitled to great deference on appeal and will be disturbed only if it is found to be against the manifest weight of the evidence. *In re A.D.W.*, 278 Ill. App. 3d 476, 482 (1996). A trial court's finding is against the manifest weight of the evidence if a review of the record clearly demonstrates that the opposite result would be the proper one. *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991). The great deference afforded to the trial court is warranted due to its superior position to observe the witnesses, assess credibility and weigh the evidence. *In re T.B.*, 215 Ill. App. 3d at 1062.

■ On appeal, respondent contends the trial court should have conducted a hearing, pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to determine the admissibility of evidence regarding the medical diagnosis of factitious disorder by proxy. Respondent contends the State failed to establish that the diagnosis has gained general acceptance in the psychological and psychiatric communities. See *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63,

76-77 (2002) (the admission of expert testimony is governed by the standards expressed in *Frye*, which dictates that scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs).

 The decision to admit expert testimony is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). Expert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence. *Snelson*, 204 Ill. 2d at 24. At trial, respondent failed to either object to the admissibility of any expert's testimony regarding factitious disorder by proxy or file a motion for an evidentiary hearing to determine its admissibility under *Frye*. Because the record establishes that respondent did not object to the testimony regarding factitious disorder by proxy at trial, we find that this issue has been forfeited on appeal. *Snelson*, 204 Ill. 2d at 25.

Respondent urges us to review this issue under the plain error doctrine, which encompasses errors that are obvious, would affect substantial rights, and, if uncorrected, would be an affront to the integrity and reputation of the judicial system. 134 Ill. 2d R. 615(a); *State v. Campbell*, 264 Ill. App. 3d 712, 725 (1992). We find no plain error in the trial court's admission of the expert testimony here.

The crux of respondent's argument is that factitious disorder by proxy has not achieved general acceptance because it is not a formal diagnosis under the DSM-IV standards (American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, at 781-83 (4th rev. ed. 2000)). The *Frye* standard, however, does not demand unanimity, consensus, or even a majority to satisfy the general acceptance test (*Donaldson*, 199 Ill. 2d at 88), and the trial court will apply the *Frye* test only if the scientific principle, technique, or test offered by the expert to support his or her conclusion is new or novel (*In re Marriage of Bates*, 212 Ill. 2d 489, 519 (2004)). Generally, a scientific technique is new or novel if it is original or striking or does not resemble something formerly known or used. *Donaldson*, 199 Ill. 2d at 79.

We note that all the experts, including respondent's, testified consistently at trial that factitious disorder by proxy was a recognized research criteria diagnosis by the American Psychiatric Association instead of a formal diagnosis because more research was needed before it could appear in the body—rather than appendix—of the diagnostic manual and researchers had not yet developed a specific profile regard-

ing what symptoms indicated the disorder. We also note that other jurisdictions have found evidence regarding factitious disorder by proxy, earlier known as MSBP, admissible under either *Frye, Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), or state rules of evidence. See *People v. Phillips*, 122 Cal. App. 3d 69, 86-87, 175 Cal. Rptr. 703, 713-14 (1981) (testimony regarding objectively verifiable symptoms leading to a diagnosis of MSBP was admissible as garden variety expert testimony, was not a new scientific development, and it made no difference that the syndrome might be an unrecognized illness or not listed in the diagnostic manual of mental disorders); *State v. Hocevar*, 300 Mont. 167, 184-85, 7 P. 3d 329, 341-42 (2000) (expert testimony regarding MSBP was not novel to the field of pediatrics or law and was admissible under the rules of evidence); *In re Suffolk County Department of Social Services*, 215 A.D.2d 395, 396, 626 N.Y.S.2d 227, 228 (1995) (trial court properly found that mother and her son presented a case of MSBP and that mother's care of son fell within the statutory definition of neglect); *Reid v. State*, 964 S.W.2d 723, 726 (Tex. App. 1998) (MSBP testimony was admissible under rules regarding admissibility of expert testimony).

Furthermore, respondent presented her own expert testimony regarding factitious disorder by proxy. Dr. Galatzer-Levy and Dr. Powell testified at the adjudication and disposition hearings, respectively, regarding the criteria of the research diagnosis and asserted that respondent did not suffer from factitious disorder by proxy. Moreover, respondent vigorously questioned Dr. Hetland and cross-examined Drs. Miller and Kalichman regarding their testimony or diagnosis of factitious disorder by proxy. Traditional methods, such as cross-examination and rebuttal witnesses, offered respondent the opportunity to challenge the experts' conclusions during trial in front of the fact finder. In any event, the trial court's finding of abuse and neglect was not based on a finding that respondent suffered from factitious disorder by proxy. Rather, the court found that respondent's alleged *conduct*, which certain experts diagnosed as consistent with the disorder, did in fact occur and that such conduct constituted abuse and neglect under the Juvenile Court Act. Regardless of whether respondent had factitious disorder by proxy, and regardless of whether expert testimony regarding the disorder necessitated a *Frye* hearing, the testimony regarding the diagnosis of the disorder did not prejudice respondent in this case because there was abundant evidence that respondent's conduct subjected the minors to abuse and neglect. Accordingly, the trial court did not err in admitting the testimony of factitious disorder by proxy.

■ Next, respondent contends that proof of neglect should have focused on her alleged actions, rather than her alleged mental health condition. Respondent argues that it was not enough for the State to show simply that she suffered from a mental illness; rather, the State must also show that the mental illness placed the children in an injurious environment. See *In re Faith B.*, 216 Ill. 2d 1, 14 (2005). We find that the evidence adduced before the trial court sufficed to make this showing. Clearly, respondent's inability to properly report her children's medical problems and continued insistence that they suffered from certain illnesses that they did not actually have caused the children to receive unnecessary medication, undergo extensive and unnecessary testing, and delayed treatment that was needed for an actual illness.

Respondent repeatedly falsely reported to medical personnel that Derrick had a brain tumor or cyst removed. Respondent repeatedly alleged Derrick suffered from seizures and was home-schooled because the condition frightened his teachers. However, his teachers never saw him suffer from a seizure, and test results indicated that he did not suffer from seizures. Respondent also repeatedly reported that Derrick suffered from a heart infection or disorder, but test results confirmed that his mild tricuspid and pulmonary insufficiencies were clinically insignificant and he did not have any serious or treatable heart defects.

Furthermore, respondent falsely reported that Takyrah was put on a ventilator when she was born, was hearing impaired and was scheduled for brain and heart surgery. Respondent also misreported the dosage of Takyrah's different medications. In addition, respondent failed to seek appropriate medical care for Takyrah, who suffered brain damage after respondent waited three hours to call an ambulance when she found Takyrah not breathing and blue. Thereafter, Takyrah had severe disabilities that needed continuous care and monitoring and was referred to home health nursing services and physical, occupational and speech therapy, but respondent failed to enroll her in those services.

Respondent falsely reported that Khayla had hemophilia, and the resulting tests that disproved that claim left Khayla anemic and put her at risk by delaying her necessary hernia surgery. Respondent also falsely reported that Khayla had diabetes, received oxygen at home, and received insulin shots twice a week from a home health care nurse named Shirley.

Respondent failed to accurately administer medications. She gave Isiah a near fatal dose of anti-seizure medication in 1996, improperly administered seizure medication to Derrick, and combined in one container the different prescriptions of different children.

In addition, in 2001, Khayla was adjudicated neglected based on an injurious environment and lack of care. Specifically, she was diagnosed with nonorganic failure to thrive because she was not receiving proper nutrition while in respondent's care. Khayla's medical issues due to her premature birth were resolved by her first follow-up visit after her hospital discharge. However, Khayla was readmitted to the hospital twice for failure to thrive. Contrary to respondent's allegations that Khayla was difficult to feed and vomiting her food, hospital staff reported that she was eager and easy to feed. Moreover, Khayla consistently gained weight each time she was in the hospital.

■ We therefore affirm the trial court's adjudication of neglect based on an injurious environment and abuse based on a substantial risk of serious harm. The trial court's conclusions that the children were in an injurious environment and at risk of harm based on respondent's conduct, limited cognitive ability, and mental health issues were not against the manifest weight of the evidence.

Next, respondent contends that, although Khayla was adjudicated neglected or abused, the State failed to prove anticipatory neglect to the remaining children where there was no evidence as to the current care and condition of each child. However, the record refutes respondent's assertion that there was no evidence that any child aside from Khayla was at risk of neglect or abuse.

■ Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside with an individual who has been found to have neglected or abused another child. *In re Arthur H.*, 212 Ill. 2d at 468. The theory of anticipatory neglect flows from the injurious environment concept set forth in the Juvenile Court Act. *In re Arthur H.*, 212 Ill. 2d at 468. There is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household. *In re Arthur H.*, 212 Ill. 2d at 468. Rather, such neglect should be measured by the circumstances surrounding the sibling, and the care and condition of the child in question. *In re Arthur H.*, 212 Ill. 2d at 468. Although proof of neglect of one minor is admissible evidence on the issue of the neglect of any other minor for whom the parent is responsible, it does not constitute conclusive proof of the neglect of another minor. *In re Arthur H.*, 212 Ill. 2d at 468. Each case must be reviewed according to its own facts. *In re Arthur H.*, 212 Ill. 2d at 468-69.

■ As detailed above, the State put forth ample evidence that respondent's false medical reports and harmful actions and inactions were not confined to Khayla. An appendix in the PAT report

documented respondent's false reports throughout the medical history of Derrick and Takyrah, in addition to Khayla. Furthermore, Drs. Miller, Hetland and Kalichman testified regarding respondent's false reports of Derrick's and Takyrah's medical conditions or symptoms. In addition, Isiah was hospitalized from a near fatal dose of Dilantin. Moreover, respondent's own experts, although they disagreed with the diagnosis that respondent suffered factitious disorder by proxy, stated that her limited cognitive abilities or adjustment disorder with depressed mood impaired her ability to independently care for six children, two of whom had special needs. Respondent presented no persuasive evidence to rebut the State's evidence that her misrepresentations, or actions or inactions created an injurious environment for all her children.

In respondent's notice of appeal and the conclusion of her appellate brief, she stated that she is appealing the court's disposition order that she was unable to parent the children. In her argument, however, she failed to address the court's dispositional ruling. Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing. 188 Ill. 2d R. 341(e)(7). Accordingly, respondent has waived review of the trial court's dispositional order, and we affirm the dispositional ruling.

The trial court's findings that Lateasha, Derrick, Devon, Isiah, Takyrah and Amarion were abused due to a substantial risk of physical injury and neglected due to an injurious environment are supported by the manifest weight of the evidence. The orders of the circuit court are affirmed.

Affirmed.

McNULTY, P.J., and O'MARA FROSSARD, J., concur.