2023 IL App (1st) 230006

THIRD DIVISION
August 2, 2023

No. 1-23-0006

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* JEH. R. and JEN. R., Minors | ) | Appeal from the Circuit |
| | ) | Court of Cook County |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 21 JA 117, 21 JA 118 |
| | ) | |
| v. | ) | |
| | ) | |
| C.Z., | ) | Honorable |
| | ) | Demetrios Kottaras |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Reyes and D.B. Walker[*] concurred in the judgment and opinion.

**OPINION**

¶ 1    In this appeal, respondent, mother, C.Z., challenges the circuit court's adjudication order

finding that her minor daughters, Jeh. R. and Jen. R., were neglected due to an injurious

environment.

¶ 2    The record shows that Jeh. was born on May 9, 2010, and Jen. was born October 29, 2012,

to C.Z. and father, D.R., who is not a party to this appeal. On February 17, 2021, the State filed

petitions for adjudication of wardship and motions for temporary custody alleging that Jeh. and

_____

[*]Justice D.B. Walker was substituted on the panel for Justice Burke upon Justice Burke's
retirement.

Jen. were neglected due to an injurious environment and abused due to a substantial risk of physical injury. The petitions alleged that there was a history of domestic violence between the parents and in front of the minors, that the minors expressed fear of both parents at different times, and that C.Z. had been physically aggressive and violent toward the girls, including that she had "pinched, slapped, and kicked them, pulled their hair, and pointed a knife at them." The petitions also noted that C.Z. had reported that D.R. had threatened to kill her "and/or their children" and that the family had been offered and recommended intact family services but C.Z. refused. The petition further noted that C.Z. and D.R. were in the process of divorcing.

¶ 3    The public guardian was appointed as attorney and guardian *ad litem* (GAL) for the minors, and the public defender was appointed as attorney for C.Z.

¶ 4    On February 22, 2021, the court entered a temporary custody order, finding probable cause and urgent and immediate necessity without prejudice based on the facts alleged in the petition.

¶ 5    On June 17, 2021, following a multi-day hearing, the trial court entered a written order. The court found that the case was an "example of a highly toxic divorce" and that both minors had been "coached to varying degrees." The court noted that C.Z. had made allegations that D.R. had committed sexual abuse against the minors and the court found it "most disturbing," and "a perfect example of toxicity" that C.Z. made those allegations while also agreeing to alternate weekend visitations between D.R. and the minors. The court expressed that it would be "forwarding a copy of the transcript of his findings to *** the Domestic Relations Judge overseeing the divorce between the parents so that there is a consideration for therapy for both minors, [and] appropriate psychological evaluations [of] both mother and father, but particularly of mother." The court, however, found that the level of "abuse/neglect d[id] not rise to probable cause" or urgent and immediate necessity, and dismissed the petitions.

¶ 6     The trial court, however, granted the assistant public guardian's oral motion for a stay of the dismissal order, and ordered that all services—including placement, visitation, and therapy—should remain in effect.

¶ 7     The public guardian filed a motion to reconsider on July 1, 2021, which was granted on July 7, 2021. The court noted in its order that the public guardian had presented additional evidence, including a typed statement of a minor and a letter from a therapist.[1] The court found the new evidence to be newly discovered, and considering the new evidence along with the prior evidence, the trial court found probable cause of abuse and neglect, as well as urgent and immediate necessity to take temporary custody of the girls with prejudice.

¶ 8     The parties appeared for adjudication via Zoom on June 29, 2022. An Arabic interpreter was present for C.Z. The assistant state's attorney indicated an intent to proceed only on the ground of neglect due to an injurious environment.

¶ 9     Jessica Connors testified that she was the social worker at the Chicago public school that the minors attended between 2019 and 2021. Connors had received a degree in psychology and a master's degree in social work specializing in schools and families. She had worked as a school social worker for eight years. As a school social worker, she provided therapeutic support for students, teachers, and families, including individual and group counseling, and "push[ed] into" classrooms for social and emotional learning. Connors testified that she is a mandated reporter.

¶ 10     Connors met Jeh., Jen., and C.Z. when the minors enrolled at the school. In the fall of 2019 and early spring of 2020, when school was conducted in person, Connors had almost daily communications with C.Z. when the girls were dropped off. Connors testified that C.Z. spoke to

---

[1]This court notes that statement and letter do not appear in the record on appeal. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (in the absence of a complete record on appeal, we presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis).

her about the history of domestic violence with D.R., and about C.Z.'s experience living in a domestic violence shelter. Connors testified that she observed C.Z. to have rapid speech and that she would sometimes answer different questions than what was being asked. Connors also observed that sometimes C.Z. would have a "heightened emotional state," acting "frazzled or emotional," and that she would not follow the conversation on those occasions. Connors testified that she and C.Z. would communicate in English, and Connors was aware that C.Z.'s primary language is Arabic. Connors described C.Z.'s English as generally clear and understandable.

¶ 11 Connors had in-person interactions with Jeh. and Jen. until March of 2020. These interactions continued virtually due to the COVID-19 pandemic through February of 2021. From the beginning, Connors observed that Jen. struggled with coming to school and participating. Connors described Jen. as "very withdrawn" and noted that her "social wellbeing was affected." After the change to virtual learning during the COVID-19 pandemic, Jeh. also became more withdrawn, and she began to reach out to Connors for support much more frequently than she had before. On a daily basis, Jeh. would reach out to Connors via chat, without going off mute or putting on her video. In October 2020, Jeh. reported to Connors that C.Z. had knocked her glasses off her head, breaking them. Jeh. told Connors this had happened three or four times, breaking multiple pairs of glasses. Jeh. also told Connors that C.Z. would kick and pull the hair of both girls in the home. When Connors would ask Jeh. to put on her video or go off mute, Jeh. would respond that C.Z. was nearby and Jeh. did not feel safe. Connors noticed that, during virtual learning, both girls often would not appear on camera, and they would not want to speak aloud in class or in a Zoom breakout room. On rare occasions, Jeh. would put on her video but she would only show the top of her head, and not her face, on the screen. When asked to move the camera to show her face, Jeh. would either refuse or not respond.

4

¶ 12    In December 2020, Jeh. e-mailed Connors around 11 p.m., informing her that C.Z. was angry and that Jeh. had spread ketchup in the home to retaliate. Connors acknowledged that this was something that would likely cause a parent to become upset, but Connors was concerned because it was unusual for students to send e-mails late at night. Connors observed that Jeh. was "pretty upset" about the incident and she thought that Jeh. "needed to communicate what was going on in the home to somebody."

¶ 13    Around the same time, in December 2020, Jeh. chatted with Connors, and the two went in a breakout room during a Zoom class so that they could have a private conversation. Jeh. refused to go off mute or put her camera on, so the conversation occurred via chat. Jeh. told Connors that C.Z. was nearby and that she did not feel safe. Jeh. also talked to Connors about her parents' divorce and Jeh.'s belief that C.Z. was "trying to frame" D.R. for physical, sexual, and mental abuse. Based on the relationship Connors had developed with Jeh., and Connors's observations of Jeh. as smart and articulate, Connors believed Jeh.'s reports.

¶ 14    Over time, Connors became increasingly concerned about the minors' emotional and mental well-being, and other teachers contacted Connors with similar concerns. As a mandated reporter, Connors made numerous calls to the Department of Children and Family Services (DCFS) hotline relating to Jeh. and Jen., and she recalled constantly calling to follow-up on those hotline calls, especially during December 2020.

¶ 15    The State next called Essalh Abdulla, who had worked with C.Z. and her children as a therapist at Apna Ghar, a domestic violence organization. Abdulla testified that she is a certified domestic violence counselor, and received her master's degree in social work in May 2020. Abdulla clarified that, as a counselor, she provided support to clients, but she could not make psychiatric diagnoses. However, she did at one point recommend that C.Z. undergo a psychiatric

assessment after consulting with her supervisor, Sara Heidbreder, who was a licensed clinician and who had also previously worked with C.Z.

¶ 16    Abdulla initially worked with C.Z. individually, but then began to provide counseling services to the minors as well. When Abdulla first began to work with the family in the fall of 2020, Jeh. and Jen. were living with C.Z. At that time, Abdulla became concerned about their wellbeing. Both girls reported C.Z.'s "name calling, making fun of their appearances, [and] talking down on their performance in school." Jen. also reported not being cleaned and bathed, noting that she was not able to do it on her own and that C.Z. would not assist her. Jeh. told Abdulla that they did not have proper meals, that their fridge usually did not have any food, and that they would snack throughout the day to eat. Abdulla testified that the minors also told her that C.Z. would discipline them by taking their electronics, preventing them from having any contact with D.R. The minors also reported that C.Z. would throw things at them and pull their hair. Both minors specifically informed Abdulla that they were not happy living with C.Z.

¶ 17    Abdulla described one specific occasion during which C.Z. called the police on Jeh. and Jen., who were then, respectively, 10 and 7 years old. C.Z. told police that the minors had hit C.Z. and requested an order of protection against them. Abdulla testified that she questioned C.Z. about why she thought that requesting an order of protection against her children was appropriate and that C.Z. then gave a different reason why she had called the police. Abdulla believed that this was one example of C.Z. "gaslighting" Jeh. and Jen.

¶ 18    At some point, the minors stopped residing with C.Z. and were instead living with their paternal grandmother. During this time, Abdulla continued to provide support to Jeh. and Jen. When living with their grandmother, Abdulla noticed a positive change in the minors' demeanor. Abdulla recalled that the girls would often miss appointments or come late while living with C.Z.

However, they were consistent and on-time when living with their grandmother. Additionally, they reported being well cared for in their grandmother's home.

¶ 19   Abdulla further testified that she wrote a letter outlining her concerns on July 1, 2021, and that letter was admitted into evidence. Abdulla explained that the letter described events and issues dating back from September 2020 through February 2021. In the letter, Abdulla outlined her history with the family, stating that she eventually terminated sessions due to C.Z.'s "constant attempts to manipulate and gaslight both her daughters and I." She recounted the incident in which C.Z. requested an order of protection against the minors, claiming that they were "abusive" and that C.Z. "feared for her life." Abdulla stated that she explained to C.Z. why her actions were inappropriate. At that point, C.Z. changed her story to say she feared for the children's safety because they were leaving the house. Abdulla wrote that she believed C.Z. needed professional help beyond what the organization could offer, further stating that she had encouraged her multiple times to see a psychiatrist for an evaluation, but that C.Z. refused, expressing her fears of what a diagnosis would mean for her custody battle. Abdulla wrote that she could "no longer support the narrative that [C.Z.] is capable and competent to parent the girls" and that the "vicious cycle of [the minors] being continuously returned to their mother after reporting and complaining about the abuse and neglect is detrimental to [the minors'] mental health."

¶ 20   The State called D.R., who testified that a DCFS investigator was assigned to the family's case in October 2020. Later that same month, Jeh. and Jen. were placed in D.R.'s mother's home under a DCFS safety plan. The safety plan was terminated in November of 2020, and the children were returned to C.Z. However, in early December 2020, the minors were again removed from C.Z.'s care and placed back in a safety plan with the paternal grandmother. D.R. testified that he signed off on some of the safety plans.

¶ 21    The State and the minors rested. C.Z.'s oral motion for directed finding was denied.

¶ 22    C.Z. called Colleen Breems, a senior associate at a law firm. Breems testified that her practice involved almost exclusively family law and included child representative and GAL work. Breems was appointed as attorney for Jeh. and Jen. on January 12, 2021, and the appointment was converted to child representative on February 8, 2021. After her appointment, Breems reviewed the relevant pleadings and orders, contacted the GAL, and set up appointments to meet with the family. Breems first met with D.R. and the children near the middle of January in 2021 via Zoom. She initially spoke to D.R. alone, who told her he was at his mother's residence. D.R. informed Breems that communication between him and C.Z. "was always real bad" and that there had "been a lot of screaming." D.R. told Breems that he believed that C.Z. was abusive toward Jeh. and Jen., but that the assigned GAL was not taking his concerns seriously. D.R. did not provide specifics about the abuse, but generally reported that he believed that the minors were being "harmed and yelled at" by C.Z. Breems testified that D.R. showed her two videos from 2018 in which the minors described abuse. In one of those videos, Jeh. reported that C.Z. threw a car seat at her. However, Breems ultimately found it "notable" that there were no orders of protection, emergency motions, police reports, or medical records supporting D.R.'s claims, which she would expect to see in such circumstances.

¶ 23    Breems also spoke with Jeh. and Jen. on January 14, 2021, and again later that month. During both meetings, they were at their grandmother's home on Zoom with no one else present. Breems testified that, during their first conversation, the minors disclosed abuse by C.Z., highlighted C.Z.'s bad character, and brought up concerns about C.Z.'s medical needs. Breems described the girls as being unable "to talk fast enough," noting they were very outspoken and forthcoming. Both children explained that the abuse was mostly directed at Jeh. and that C.Z.

would "yell at *** and hurt" Jeh.

¶ 24    In the second meeting, Breems observed that Jen. was "completely withdrawn" and would not talk. At that meeting, Jeh. generally described C.Z. pinching, yelling, and cursing at the minors, as well as several specific incidents. These incidents included one in which Jeh. believed that C.Z. tried to intentionally leave her on a CTA train and another in which C.Z. threw a Rubik's cube at Jeh., almost hitting Jeh.'s face. Jeh. also reported that C.Z. threw her to the bathroom floor twice, in September and December of 2020. Jeh. also told Breems that C.Z. "pushed, hit, and pulled the ears of both of the children, [and] that [Jeh.]'s glasses [had been] *** broken" seven times in four months. Jeh described one specific occasion in December 2020, when C.Z. pushed her into a gap between a futon and the wall, breaking her glasses. Jeh. admitted to Breems that she would frequently talk back to and curse at C.Z. and that she once threw a water bottle at C.Z.'s face because Jeh. was angry.

¶ 25    Jeh. also told Breems about an incident during which C.Z. called the police on the minors, after C.Z. said that the minors "were trying to escape from her." Jeh. told Breems that she and Jen. were sitting on the steps outside the apartment door because Jeh. did not like "being called names or yelled at or screamed at by" C.Z. Jeh. described C.Z. as being "especially mad and grumpy that day."

¶ 26    Based on Breems's conversations with the minors and her experience, Breems believed the girls were being "coached." Breems believed that the minors' stories were inconsistent and that the minors, who were then in second and fifth grade, were using language that was "a bit mature" for children their age.

¶ 27    Breems testified that in February 2021, she filed an emergency motion before the domestic relations court to return the minors to C.Z., based on Breems's understanding that a valid safety

plan was not in place. However, the domestic relations court did not return Jeh. and Jen. to C.Z.

¶ 28    On cross-examination, Breems acknowledged that she never spoke to Jeh.'s teacher or Connors and that she only had two conversations with the minors during the time that she was assigned to the case, with each conversation lasting about one hour. Breems further testified that she never had the opportunity to speak to the minors individually. Breems also acknowledged that, although she based her conclusion that the minors had been coached in part on the fact that there had been no supporting documents such as emergency motions or orders of protection to substantiate the claims of abuse, D.R. had attempted to file emergency motions and orders of protection in October 2020. Breems understood that there was an order in place that D.R. needed to communicate with the GAL first, "before taking any self-help measures" and agreed that D.R. had initially communicated to her his beliefs that the GAL was not taking his concerns seriously. Breems also testified that she believed that a safety plan needed to be signed by "the parents," and she did not know if it was sufficient for only one parent to sign.

¶ 29    When questioned by the court, Breems stated her focus was on the children in the context of the divorce and working out a parenting agreement, including issues such as decision-making regarding school or religion, coordinating exchanges for parenting time, and sole versus joint custody arrangements. Most of the cases in which Breems had been appointed did not involve abuse and neglect, and she had never been required to reach a conclusion as to whether a child was abused or neglected.

¶ 30    C.Z. next called David Gotzh, who testified that he was appointed as GAL for Jeh. and Jen. in the spring of 2020. Upon appointment, he was provided with the orders and pleadings, which he reviewed before meeting with the parties. Gotzh first met with D.R. to observe D.R.'s residence and interview him. D.R. reported that he and C.Z. had a difficult marriage and that there had been

"numerous times that the police had to come out and get involved." Gotzh noted that there had been three DCFS investigations over the course of his appointment before temporary custody was taken. Gotzh also noted that both parents had made allegations against each other—C.Z. alleged that D.R. was sexually abusing the minors, and D.R. alleged that C.Z. was physically abusive— but Gotzh found the accusations to "lack specificity." Regarding C.Z.'s allegations of sexual abuse, Gotzh observed that C.Z. never gave any details of specifics about the alleged sexual abuse and the minors denied that they had ever been touched inappropriately by D.R. Gotzh found it "curious" that after C.Z. told Gotzh that D.R. was "allegedly molesting or abusing these children in a sexual manner," she then indicated that she "was okay with" D.R. "hav[ing] alternate weekends unsupervised with the children." Gotzh ultimately believed that C.Z. was using the accusations "for litigation advantage as opposed to [the sexual abuse] actually occurring."

¶ 31    Gotzh met with C.Z. a month or two after he was appointed. Gotzh testified that it took that long because C.Z. initially refused to disclose her address, and Gotzh was able to visit C.Z.'s home only after the domestic relations court ordered her to provide it. Gotzh observed C.Z.'s home and interviewed her, then set up a separate appointment to speak with Jeh. and Jen. privately at his office while C.Z. sat in the waiting room. At this meeting, the minors did not relay any fear of either parent, and Gotzh had no concerns about the minors' wellbeing.

¶ 32    In the spring of 2020, Gotzh learned of an incident in which one of the minors had to be brought to the hospital due to an injury, and both parents were present at the hospital. Gotzh testified that he became aware that C.Z. and D.R. had a "verbal dispute" at the hospital that "got fairly ugly," and the argument prompted one of the doctors to call DCFS.

¶ 33    In the fall of 2020, Gotzh became aware of allegations that Jeh.'s and Jen.'s faces were being scratched by C.Z. and that C.Z. would cover up the scratches using make up. Gotzh had a

11

visit with the minors at C.Z.'s residence in November 2020, and Gotzh did not observe scratches on their face, nor did the minors "corroborate" those allegations at the meeting.

¶ 34    Gotzh also noted that Jeh. reported that sometime in September or October 2020 she had been shoved in the back by C.Z., causing her glasses to fall to the floor and break. Gotzh testified that he asked C.Z. about this incident and C.Z. neither admitted nor denied the allegation. Gotzh found that this was not consistent with other occasions in which she had "gone to great lengths" to deny prior allegations of abuse. On this occasion, however, C.Z. "would not commit to a 'yes' or 'no.' " Gotzh testified that the minors' did not bring up any other abuse, and that Jen. told Gotzh that C.Z. had never hit her because she "was mom's favorite."

¶ 35    On cross-examination, Gotzh acknowledged that in one of his reports, he recommended that C.Z. engage in anger management services.

¶ 36    At the conclusion of evidence, the State and the minors argued for findings of neglect due to an injurious environment. C.Z. argued the petitions should be dismissed, contending that she was a victim of domestic violence and that parents are allowed to discipline their children. D.R. argued that the evidence against him all came from C.Z., maintained that he had shown a willingness to cooperate with DCFS, and asked that he be found "non-custodial."

¶ 37    On September 9, 2022, the court found Jeh. and Jen. were neglected due to an injurious environment. In an oral ruling, the court extensively reviewed the evidence, noting in particular testimony from Connors. The court observed that Connors had developed a relationship with the children, that her greatest concern appeared to be the emotional wellbeing of the minors, and that she believed they were negatively impacted living with C.Z. The court also noted Connors' testimony that the minors reported that they did not feel safe with C.Z., and that C.Z. would kick, slap, and pull their hair and that she had knocked Jeh.'s glasses off her head three or four times.

¶ 38    The court also described Abdulla's testimony, in particular, regarding the minors' reports that C.Z. would pull their hair, throw things at them, make fun of their appearances, talk down about their school performances, and take their electronics to prevent communication with D.R.

¶ 39    Turning to C.Z.'s witnesses, Breems and Gotzh, the trial court noted that the "function and role" of a GAL in divorce proceedings is "considerably different" than in the child protection division. The court observed that the witnesses had limited experience in child interviewing in the types of cases heard in juvenile court. Nonetheless, the court noted that Breems's testimony corroborated the reports of pinching, yelling, cursing, and pushing and that she also relayed Jeh.'s glasses had been broken seven times in a four-month period. The court also described Gotzh's testimony that he raised the incident with the broken glasses with C.Z., and C.Z. did not deny that it had occurred.

¶ 40    Finally, the trial court noted that Jeh. and Jen. had been removed from C.Z.'s care for periods of time, and that there had been an overall improvement in their behavior and demeanor when away from C.Z.

¶ 41    The court explained that it was concerned with "repeated complaints of the children being kicked, slapped, and hav[ing] their hair pulled," as well as the reports that C.Z. "on multiple occasions, struck the one child to the point where glasses were knocked off the child's head while she was wearing them." The court was also concerned that the children reported not feeling safe with C.Z. The court explained that an "isolated incident alone, though distasteful, would not be as concerning. However, the repeated behavior by [C.Z.] causes the court concern, and I believe supports the finding [of neglect]."

¶ 42    The court further observed that D.R. "was no angel," and that the "back and forth by mother and father" contributed to the toxic and negative environment. The court ultimately concluded,

however, that the finding of neglect was "based on mother's behavior."

¶ 43    C.Z.'s motion to reconsider the trial court's adjudication findings was denied.

¶ 44    The case then proceeded to a dispositional hearing on December 9, 2022. An Arabic interpreter again provided translation for C.Z.

¶ 45    The State offered and the court admitted into evidence a DCFS Integrated Assessment (IA), dated May 13, 2021. In the IA, the assessor noted that the prognosis for reunification of Jeh. and Jen. with either C.Z. or D.R. was "poor." Regarding C.Z., the assessor explained that she

> "did not appear to be able to keep [Jeh. and Jen.] safe during incidents of partner violence and had a history of physical abuse and neglect toward their care. [C.Z.] had limited insight into [Jeh. and Jen.]'s experiences and was unable to acknowledge her role in the reason for case opening. She reported being open to services, showing her willingness to engage for reunification; her prognosis may improve upon her participation in recommended services. In order for her prognosis to improve, [C.Z.] must address her mental and medical health needs and intimate partner violence, as well as build developmentally appropriate parental skills. [C.Z.] must be able to provide a safe environment for and relationship with [Jeh. and Jen.]."

¶ 46    The court also admitted two court reports generated by the agency case worker on September 26, 2022, and December 8, 2022. In those reports, the case worker noted that she had attempted to discuss C.Z.'s participation in services, but C.Z. would not engage in conversations about services without first speaking with her attorney. The reports also noted that both children had been vocal about not wanting to return to either parent and instead wished to stay with their grandmother. They did, however, indicate that if they had to return home to a parent, they would

prefer to live with D.R. The reports also indicated that C.Z. had been participating in supervised visitation with the minors twice a week, but that "things were said at visits that caused the girls to withdraw from interacting with" C.Z. and that both minors expressed their desire that visitation with C.Z. be reduced to once per week.

¶ 47    Quiana Randle, the caseworker from One Hope United, testified she was assigned to the family's case since July 2022. She reported that the minors' placement with their grandmother was safe and appropriate, that they were doing well in the grandmother's home and academically, and that a referral had been made for each to receive therapy. Regarding D.R., she testified that he had been engaging in individual therapy and regularly attended supervised visitation. Randle reported that he had previously completed parenting classes. Finally, she stated a referral to domestic violence services was pending.

¶ 48    Randle further testified that there was a recommendation that C.Z. engage in individual therapy, parenting classes, and domestic violence services, and C.Z. was referred to Arab-American Family Services in July 2022. At the time of dispositional hearing, however, C.Z. was not engaged in, nor did she express any interest in engaging in, therapy. Randle testified that C.Z. told her that she did not believe in services.

¶ 49    Randle also testified that C.Z. had been having twice-weekly supervised visits with Jeh. and Jen. The visit usually occurred at a mall, and they were supervised by Randle. Randle testified that in September 2022, the children requested that the frequency of visits be changed to once weekly. Jeh. and Jen. told Randle that they were not getting much out of the visits, and Jeh. additionally expressed feeling blamed for Jen.'s behavior during visits. Jeh. further told Randle that she felt her relationship with C.Z. was not improving and they were not spending much time together, but instead Jeh. was expected to watch Jen. during visits.

¶ 50    Randle observed that some visits would go well, and others "wouldn't go so well." Randle believed that the visits were "more focus[ed] on shopping" than on spending time with the girls. Randle testified that she often found herself, rather than C.Z., spending time with the minors. Randle elaborated that C.Z. would often shop during the visits. On one occasion, C.Z. got her eyebrows done while Randle and the minors walked around the mall. During another visit, C.Z. got her nails done while Randle and the children sat in the shop waiting. Randle felt that the children were not "the full focus of the visit."

¶ 51    Randle further testified that visits were subsequently reduced and moved to a library. Those recent visits were more successful, and C.Z., Jeh., and Jen. were able to have more quality family time. Randle believed that parent coaching or family therapy could assist C.Z. and her daughters in building their relationship, but C.Z. needed to engage in individual services first.

¶ 52    Randle also clarified that she had not used an interpreter to communicate with C.Z. as she appeared to understand English. She further explained that C.Z. speaks to the girls in English and the girls do not speak Arabic.

¶ 53    Randle testified that, in her opinion, it would be in the minors' best interest that a DCFS guardianship administrator be appointed with rights to place them. This would also provide the parents with additional opportunities to engage in services and make progress.

¶ 54    C.Z. testified that she does not always fully understand English and that her divorce attorney advised her not to sign any papers or attend any services. She testified, however, that if the court would give her children back, she would agree to do services.

¶ 55    After all parties rested, the State and the assistant public guardian requested that the minors be made wards of the court and placed in DCFS guardianship and that the court make a finding that both parents were unable to parent. C.Z.'s counsel asked the judge to "admonish [C.Z.] and

explain that these services are required and [that they are] something that would benefit her and her daughters so that we can move forward with this." Counsel argued that DCFS had not set up a "family team meeting" and had also not provided C.Z. with an interpreter. Counsel questioned DCFS's actions in this matter, asserting that the agency had "left the family "hanging for *** almost a year." Counsel concluded, "I would be asking that [the court] only find my client unable [to parent] at this time."

¶ 56     On December 9, 2022, the court adjudicated Jeh. and Jen. wards of the court, found both parents unable to care for the children, and appointed the DCFS guardianship administrator as guardian with the right to place. C.Z. filed a notice of appeal on December 27, 2022.

¶ 57     In this appeal, C.Z. asserts that the finding that Jeh. and Jen. were neglected due to an injurious environment is against the manifest weight of the evidence.[2]

¶ 58     In any proceeding initiated pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)), including an adjudication of wardship, the paramount consideration is the best interests of the child. *In re A.P.*, 2012 IL 113875, ¶ 18. When a petition for adjudication of wardship is filed, the Act mandates an adjudication hearing to determine whether a child is abused and/or neglected. 705 ILCS 405/1-3(1), 2-18(1), 2-21(1) (West 2020).

¶ 59     The State bears the burden of proving abuse and neglect allegations by a preponderance of the evidence, establishing that the allegations are "more probably true than not." *In re Z.L.*, 2021 IL 126931, ¶ 61; see also 705 ILCS 405/1-3(1) (West 2020); *In re J.L.*, 2016 IL App (1st) 152479,

---

[2]This court notes that, although the matter proceeded to a dispositional hearing under the Juvenile Court Act of 1987 (705 ILCS 405/2-21(2) (West 2020)), C.Z. focused her appellate argument only on the adjudication findings and raised no argument as to the dispositional order. Accordingly, any challenge to the dispositional order is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***.").

¶ 86. The focus of an adjudication hearing is whether a child is abused or neglected, and not whether the parents are neglectful or abusive. *Z.L.*, 2021 IL 126931, ¶ 59; *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004). Abuse and neglect findings are *sui generis*, based on the unique facts and circumstances of each case. *Z.L.*, 2021 IL 126931, ¶ 58; *J.L.*, 2016 IL App (1st) 152479, ¶ 86. Adjudicatory findings are reviewed "based on the totality of the evidence," (*In re Alexis H.*, 401 Ill. App. 3d 543, 551 (2010)) and great deference is afforded to the trial court (*J.L.*, 2016 IL App (1st) 152479, ¶ 104). This court does not reweigh the testimony or evidence because the trial court has the best vantage point and is in the best position to evaluate the evidence. *Id.* ¶ 86. The reviewing court will not substitute its judgment for the trial court's determination on the credibility of witnesses, the weight of the evidence, or the inferences drawn. *Id.* Adjudication findings will not be reversed unless they are against the manifest weight of the evidence, *i.e.*, unless the opposite conclusion is clearly evident. *Z.L.*, 2021 IL 126931, ¶ 61; see also *J.L.*, 2016 IL App (1st) 152479, ¶ 86. The trial court "has broad discretion" in determining the existence of abuse and neglect, and there is a "strong and compelling presumption in favor of the result reached by the court." (Internal quotation marks omitted.) *In re A.S.*, 2020 IL App (1st) 200560, ¶ 22.

¶ 60 The gist of C.Z.'s argument in this appeal is that the circuit court's adjudication findings are against the manifest weight of the evidence because they were based solely on "uncorroborated hearsay evidence [from the minors] that was never subject to cross-examination." C.Z. contends that the evidence in this case can be "fairly described as 'just witnesses testifying that a minor related claims of abuse or neglect to them,' " which was found to be insufficient to sustain a finding of abuse or neglect by our supreme court. See *In re A.P.*, 179 Ill. 2d 184, 198 (1997).

¶ 61 Initially, this court notes that the State elected to proceed only on the ground of neglect due to injurious environment, and did not proceed on the ground that the minors were abused due to a

substantial risk of physical injury. Under the Act, a neglected child includes one who is "under 18 years of age *** whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2020). "Neglect" has been defined as a parent or caretaker's failure to exercise the care demanded by the circumstances, including both intentional and unintentional acts. *In re Kenneth D.*, 364 Ill. App. 3d 797, 801 (2006) (citing *In re K.T.*, 361 Ill. App. 3d 187, 200 (2005)). While an "injurious environment" is an "amorphous concept," the Illinois Supreme Court has interpreted it to include when a parent breaches her duty to ensure a safe and nurturing shelter for her children. *Id.* (citing *Arthur H.*, 212 Ill. 2d at 463).

¶ 62    While the minors' reports to the various witnesses were relevant to a determination of neglect based on injurious environment, the State was not required to prove all of the minors' allegations regarding C.Z.'s physical abuse in the home for the court to conclude that they were neglected. Instead, the relevant questions are whether the minors' environment was injurious to their welfare, and whether the parents breached the duty to ensure a safe and nurturing shelter, or failed to exercise the care demanded by the circumstances. *Id.*

¶ 63    Even without the particular reports of abuse raised by the minors, the record is clear that the family had been the subject of multiple DCFS investigations, and that many individuals raised significant concerns about the minors' wellbeing and about C.Z.'s ability to parent. Those individuals included teachers, social workers, therapists, as well as a doctor who called DCFS after the parents were arguing in the hospital. There were reports that D.R. engaged in domestic violence against C.Z. in front of the children, and that C.Z. was unable to ensure the minors' safety during those incidents. There was additional evidence regarding the parents' repeated "back and forth" allegations of child abuse and neglect against one another, which the court found contributed to the minors' toxic and negative environment. Those allegations included claims by C.Z. that D.R.

19

committed sexual abuse against the minors, and yet C.Z. agreed to let D.R. have unsupervised visitation with them. The record also supports the conclusion that C.Z. had unaddressed mental health concerns, but refused to participate in recommended psychiatric evaluation or services. On one particular occasion, C.Z. called the police requesting an order of protection against the minors claiming they were abusive towards her, but later changed her story, stating that she called police because the minors were trying to leave the house. Additionally, when C.Z. was confronted by Gotzh and questioned about another incident when Jeh.'s glasses were broken, C.Z. did not deny that the incident, which Gotzh testified was unusual. The evidence before the circuit court also showed that the minors grew increasingly withdrawn and in need of support while they were residing with C.Z., and that their demeanors significantly improved after they were removed from C.Z.'s care. The minors expressed on multiple occasions that they did not want to return to living with their parents, and especially with C.Z. This evidence supports a conclusion that the minors' environment was "injurious to [their] welfare," that their parents had failed to exercise the care demanded by the circumstances, and that they had not been ensured "a safe and nurturing shelter." *Id.*

¶ 64    Nevertheless, even if the minors' reports were necessary to a finding of neglect, their reports were sufficiently corroborated. Under the Act, "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 2020). Although the Act does not define the term "corroboration," our supreme court has explained that there must be "independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred." *A.P.*, 179 Ill. 2d at 199. "Simply

put, to corroborate means to add weight or credibility to a thing by additional and confirming facts or evidence." (Internal quotation marks omitted.) *In re Z.C.*, 2022 IL App (1st) 211399, ¶ 51. There is no requirement that corroborating evidence prove the abuse or neglect; the corroborating evidence need only to add weight or credibility to the out of court statements. *Id.* The precise form of corroboration depends upon the individual facts and circumstances of the case but can include physical or circumstantial evidence. *Id.* This court has also determined that out-of-court statements of one minor can corroborate the hearsay statements of another minor and that where two minors each provide substantially similar statements regarding abuse or neglect, a court may conclude that sufficient corroboration has been provided to satisfy the provisions of the Act. ¶ 48.

¶ 65 The evidence before the circuit court showed that both minors made substantially similar statements regarding abuse and neglect, including reports that C.Z. kicked and slapped them, pulled their hair, mocked their appearance, and repeatedly struck Jeh., knocking Jeh.'s glasses off her head. The allegations remained largely consistent in reports made by both minors to multiple different people. These reports were also corroborated by the evidence outlined above, including the witnesses' observations that the minors grew increasingly withdrawn and in need of support when residing with C.Z., but presented as safe, happy, and comfortable when residing outside of C.Z.'s home and the witnesses' concerns regarding C.Z.'s unaddressed mental health issues and refusal to participate in the recommended psychiatric evaluation and services. In particular, the reports about C.Z. knocking glasses off Jeh.'s head was corroborated by C.Z.'s unusual silence when confronted about the incident and the reports that C.Z. hit Jeh. were corroborated by Jen.'s statement to Gotzh that C.Z. did not hit Jen. because she was "mom's favorite," suggesting that Jeh. was hit. The above evidence sufficiently corroborated each of the minor's statements as required by section 2-18(4)(c) of the Act (705 ILCS 405/2-18(4)(c) (West 2020)).

¶ 66    C.Z. acknowledges that this court has "recently provided a lengthy discussion" regarding corroborative evidence in the context of abuse and neglect adjudications in *Z.C.* 2022 IL App (1st) 211399. In that case, this court considered a case in which two minors both reported to a DCFS caseworker that there was no gas, heat, or electricity at the home; that they had only expired food to eat at home; that their mother would put them in water and spank them; and that they did not feel safe with the mother. *Id.* ¶ 48. Although there was no other corroborating evidence, in large part because the mother cancelled a scheduled home visit, this court determined that "the minors' similar statements corroborated one another and established that the allegations of abuse and neglect were more probable than not." *Id.*; see also *In re K.O.*, 336 Ill. App. 3d 98, 102 (2002) (a minor's statements that indicated that her father had sexually abused her, were corroborated by the statements of the minor's sibling, who witnessed the abuse); *Alexis H.*, 401 Ill. App. 3d at 561 ("the children's statements of sexual abuse corroborated each other's statements and those statements make it more probable that the children were abused").

¶ 67    C.Z. contends, however, that *Z.C.* is distinguishable because there is no evidence here that anyone interviewed Jen. separately from Jeh. C.Z. asserts that the witnesses "had a tendency to speak of the two Minors as a unit" or they would testify that "both" minors made the allegations without providing any additional detail, which she claims is "baldly insufficient corroboration."

¶ 68    This court finds no support for C.Z.'s contention that the minors must be interviewed separately for their statements to corroborate each other or that the witnesses' testimonies that both minors reported various incidents of abuse and neglect was insufficient. Moreover, and as outlined above, we find this case even stronger than *Z.C.*, as there was other corroborating evidence in addition to the statements of the minors.

¶ 69    For the foregoing reasons, we affirm the underlying adjudication order, finding that the

minors were neglected based on an injurious environment, as well as the subsequent disposition order.

¶ 70    Affirmed.

***In re JEH. R.*, 2023 IL App (1st) 230006**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-JA-117, 21-JA-118; the Hon. Demetrios Kottaras, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Kathryn Pelech, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito and Ashlee Cuza, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Kristin Eiermann, of counsel), for appellees. |