BARBARA CONNOR, Petitioner-Appellee, v. VELINDA C., Respondent-Appellant.

Fifth District    No. 5—04—0657

Opinion filed March 9, 2005.

Billie L. Johnson, of Johnson & Anderson, of Edwardsville, for appellant.

Curtis L. Blood, of Collinsville, for appellee.

JUSTICE HOPKINS delivered the opinion of the court:

The respondent, Velinda C., appeals the trial court's order awarding the custody of the parties' adopted daughter, Jasmine C., to the petitioner, Barbara Connor. Velinda argues on appeal that the trial court improperly applied the custody provisions of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/601 *et seq.* (West 2002)) to determine the parties' custody dispute and that the trial court's decision to award the custody of Jasmine to Barbara was against the manifest weight of the evidence. We affirm.

## FACTS

An adoption decree was filed on December 20, 2002. The decree terminated the parental rights of Jasmine's biological parents and declared Jasmine, who was born on October 12, 2001, to be Velinda's and Barbara's child.

On January 30, 2004, Barbara filed a petition seeking the temporary custody of Jasmine. On February 10, 2004, Velinda answered Barbara's petition and requested that the court award the custody of Jasmine to her. On February 5, 2004, the trial court entered an interim order allowing Barbara and Velinda to share the physical custody of Jasmine and establishing each party's visitation as one-half of each week.

On May 6 and July 19, 2004, the court held hearings regarding Jasmine's custody. Velinda testified that she was 41 years old and lived with her three daughters, Jessica C., age 18, Anna C., age 17, and Brittany C., age 13, along with Jasmine, who was her biological granddaughter. Velinda testified that she and Barbara lived together from June 1997 until January 2004 in Velinda's home. In 2001, Jessica, who was 15 at the time, became pregnant with Jasmine. Jessica's boyfriend, Corey Smith, who was also 15 at the time, was Jasmine's father. In December 2002, after Jessica's and Corey's parental rights were terminated, Velinda and Barbara adopted Jasmine. Velinda testified that she had assumed the custody of Jasmine to provide Jasmine with insurance and to terminate Corey's parental rights. Velinda testified that she and Barbara had promised Jessica that when Jessica finished college, they would return to court and reverse the adoption, placing Jasmine into Jessica's care. Velinda testified that before and after Jasmine's adoption, Jessica played the dominant mother role for Jasmine, that Jasmine called Jessica "mommy," and that when talking to Jasmine during visitation exchanges, even Barbara referred to Jessica as "mommy." Jessica changed Jasmine's diapers, prepared her food and bottles, bathed her, and transported her to and from the baby-sitter.

Velinda testified that after 1999, she learned that Jessica and Anna had been molested by their father, to whom Velinda had been married until 1996. Velinda notified the proper authorities and provided her daughters with counseling. On approximately five occasions in 2002, while Jasmine was living in Velinda's home, Anna attempted suicide by drug overdose, using prescription drugs from Velinda's bedroom. One attempt occurred in Velinda's home, although Jasmine was not near Anna at the time. Anna suffered from depression and self-mutilation, and in October 2003, she was convicted of a felony for distributing antidepressants at school. Brittany's therapist

indicated that Brittany, too, probably had been sexually molested by her father but that she subconsciously chose to forget. Velinda testified that she would not have a problem leaving Jasmine alone with Jessica, Anna, or Brittany.

Velinda testified that her house was very clean and that at the time of the hearing, fish were the only house pets. Velinda testified that she and the girls watched television in her bedroom, which was more like the family room. Velinda testified that she did not drink alcohol in Jasmine's presence but that she took the prescription drug Xanax until January 2004.

Velinda testified that Jasmine suffered from pneumonia and used a breathing machine to help her breathe. Velinda testified that in the spring, Jasmine took some prescription medicine which listed extreme diaper rash as a side effect and that Jasmine suffered from extreme diaper rash, although, at the time of the hearing, it had healed.

Velinda testified that Barbara suffered from headaches, backaches, and leg aches daily and took Vicodin, which was prescribed to Barbara's mother, Joanne. Velinda testified that Barbara never recovered from leukemia, that Barbara did not have the energy to cook and clean, that Barbara drank alcohol to excess, and that Barbara smoked cigarettes.

Velinda testified that since February 9, 2004, she had been employed by Financial Asset Management Systems as a bill collector for Cingular Wireless. Velinda's hourly wage was $12.69, and she worked 40 hours per week. On Mondays, Tuesdays, and Wednesdays, Velinda worked from 12 to 9 p.m., and on Thursdays and Fridays, she worked from 8 a.m. to 5 p.m. Velinda also received $840 per month in child support.

Jessica testified that since Jasmine's birth, Jasmine slept in Jessica's room and that Jessica cared for Jasmine, bathed her, changed her diapers, fed her, made her bottles, prepared her for the baby-sitter, and transported her to and from the baby-sitter. Jessica testified that even after Velinda and Barbara adopted Jasmine, Jessica remained Jasmine's primary caregiver. Jessica testified that when Barbara lived in Velinda's home, Jessica provided substantially more daily care for Jasmine than did either Velinda or Barbara.

Jessica testified that from 2001 to 2003, when Barbara and Velinda were living together, Barbara brought liquor into the house. Jessica testified that Barbara often became intoxicated and, as a result, behaved irrationally. Jessica testified that Barbara did not care for Jasmine on a daily basis by making her meals or changing her diapers.

Jessica testified that on Sunday mornings, Velinda woke with Jasmine and cooked Jasmine breakfast, bathed her, changed her

diaper, and fed her. Jessica testified that from August 2003 until February 2004, Velinda did not work outside the home and cared for Jasmine while Jessica was at school. Jessica testified that Velinda played with Jasmine and that Velinda and Jessica took Jasmine to the park and on other fun field trips.

Jessica testified that Jasmine suffered from diaper rash in general and that in March 2004, Jasmine was given antibiotics for pneumonia, which worsened her diaper rash. Jessica testified that since Velinda and Barbara's separation, Jasmine acted withdrawn. Jessica testified that on one occasion when she was curling her hair, Jasmine accidently touched the curling iron, which caused a burn to her hand. Jessica also testified that when Jasmine returned from Barbara's home on June 30, 2004, Jasmine had a blister on her hand.

Corey Smith, Jasmine's biological father and Jessica's boyfriend at the time of the hearing, testified that when he visited Velinda's home after Jasmine's birth until April 2002, he regularly observed Barbara drinking beer and becoming intoxicated. Corey testified that he did not observe Velinda using drugs. He testified that Velinda treated Jasmine as a granddaughter and that Barbara played with Jasmine by watching television. Corey testified that he changed Jasmine's diapers, bathed her, and participated in caring for her. He testified that Velinda bathed Jasmine if he and Jessica were unavailable.

Corey testified that after January 2004, he visited Velinda's household every day after work until 10 p.m. Corey testified that when he stayed overnight at Velinda's, he slept in Jessica's room and Jessica and Jasmine slept in Velinda's room. Corey testified that since Barbara left Velinda's house, the house remained clean.

Anna testified that from Jasmine's birth until January 2004, when Barbara lived in Velinda's home, Anna, Jessica, and Velinda were responsible for cleaning the house and Velinda was responsible for cooking. Anna testified that she never observed Velinda drinking alcohol after Jasmine was born. Anna testified that Jessica primarily cared for Jasmine and that Velinda helped.

Carl Springer, Jessica's boyfriend from 2002 until three weeks before the hearing, testified that from August 2002 until January 2003, he regularly transported Jessica to school. Carl testified that Jessica dressed Jasmine and that he and Jessica transported Jasmine to and from the baby-sitter. He testified that Jessica played the primary mother role in the home but that when Barbara returned from work, Barbara held, fed, and watched television with Jasmine and that Barbara occasionally picked Jasmine up from the baby-sitter. Carl testified that in the summer of 2002, he witnessed Barbara drinking up to six beers in the evenings. He testified that Jessica and Anna

cooked and cleaned Velinda and Barbara's home. Carl testified that since January 2004, he had witnessed Velinda caring for Jasmine, making her food, changing her diaper, changing her clothes, bathing her, and playing with her.

Karen Augustin, a psychotherapist who worked for Alternatives Counseling, testified that she counseled Jessica from May 2002 until August 2003. Karen visited Velinda's home and described Velinda's front room and kitchen as clean. She described Jasmine as clean, healthy, and happy. Karen testified that Barbara usually brought Jasmine from day care.

Amy Hart, a child adolescent specialist at the Community Counseling Center in Alton, testified that she counseled Anna beginning in April 2002. Amy visited Anna in Velinda's home and testified that Velinda's home was clean. Amy testified that at the end of August 2003, she observed Barbara drinking a 24-ounce beer and that Barbara's speech was slurred. Amy testified that she never observed Velinda drinking alcohol or using drugs.

Barbara testified that she was 42 years old and lived with her mother, Joanne, and her husband, Bartholomew (Bart) Grafton, whom she married on April 23, 2004. Barbara worked as a technical coordinator at St. Louis University Hospital for Renal Care Group, earning $40,000 per year. She had worked in this position for 12 years. She worked three days per week, from approximately 4 a.m. to 7 p.m. Bart also worked as a technical coordinator, earning approximately $40,000 per year. Because she suffered from heart problems and arthritis, Joanne received social security disability payments.

Barbara testified that when she lived in Velinda's home, she primarily cared for Jasmine. Barbara testified that when she adopted Jasmine, she understood that she would raise Jasmine, pay for her college, and care for her. Barbara considered Jasmine to be her daughter, loved her very much, and continued to care for her daily. Barbara testified that Joanne baby-sat Jasmine one day during the week while Barbara worked and that Joanne danced with Jasmine, cooked for her, and played in the yard with her. Barbara testified that Bart also played in the yard with Jasmine, bathed her, changed her diapers, and took her to the park and to McDonald's. Barbara testified that although she and Bart smoked cigarettes, they did not smoke in Jasmine's presence or in their home.

Barbara testified that she was last treated for leukemia before Jasmine was born and that she had not missed work due to leukemia since 2001. She acknowledged that she underwent two surgeries for a hysterectomy in 2003. Barbara testified that she never took drugs and that the Department of Children and Family Services had tested her

for drugs during the investigation of the sexual abuse allegations in Velinda's family and that she was periodically tested for drugs at work. Barbara acknowledged that on a couple of occasions, she drank a few beers in Jasmine's presence, but she denied that she ever became intoxicated. Barbara testified that since February, she had taken the prescription drug Xanax. Barbara testified that she had taken various prescription drugs in the past, but she denied that she had ever taken her mother's prescription medication.

Barbara testified that during their relationship, Velinda often received unemployment payments, that Barbara paid the majority of the bills, and that Velinda spent most of her time in bed. Barbara testified that Velinda had been addicted to Paxil for six months, that Velinda took other prescription drugs, and that Velinda drank hard liquor to the point of intoxication. Barbara testified that Velinda's older daughters destroyed the bathroom door, the walls, and the cabinets in Velinda's home and that many cats lived in Velinda's home.

Barbara testified that when in Velinda's care, Jasmine did not have a scheduled bedtime, that Jasmine was exhausted after visits with Velinda, that Velinda returned Jasmine to Barbara during the winter with no shoes, no shirt, and no hat, and that Velinda returned Jasmine with diaper rash. Barbara acknowledged that Jasmine received a blister in June 2004 from a sparkler firework that Barbara allowed her to hold.

Bart, who was 47 years old and worked for Renal Care Group at Forest Park Hospital in St. Louis, testified that his hourly wage was $20 and that he worked Monday through Friday from 8 a.m. to 4:30 p.m. Bart testified that Barbara played with Jasmine, fed her, watched cartoons with her, and took her to outings such as the park and McDonald's playland. Bart testified that Jasmine called Barbara "mom." Bart testified that he also played with Jasmine and cared for her daily. Bart testified that Joanne also played with Jasmine, fed her, took her shopping, and watched television with her. Bart testified that their three-bedroom home allowed Jasmine to have her own bedroom. Bart testified that after each visitation exchange from Velinda to Barbara, Jasmine suffered from a diaper rash but that the rash was healed before they returned her to Velinda.

Joanne, who was 60 years old, testified that after her son died, she had a nervous breakdown and received social security disability payments for depression. She testified that in 2003, she also had open-heart surgery and that she suffered from rheumatoid arthritis, which limited her activity. Joanne testified that she took prescription antidepressants daily. Joanne testified that Barbara played outside with Jasmine, fed her, changed her diapers, and showed her much affection. Joanne testified that she, too, loved Jasmine.

Gretchen Williams, who worked with Barbara at St. Louis University Hospital, testified that after Jasmine was born until 2003, she visited Barbara and Velinda's home approximately once a month. Gretchen testified that the home smelled like cat urine, that piles of clothes were strewn throughout the home, and that Velinda was usually in bed, even though it was afternoon or early evening. Gretchen testified that she observed Barbara with Jasmine after Barbara had moved from Velinda's home and that Barbara was very attentive to Jasmine, changed her diaper regularly, and played with her. Gretchen testified that Barbara's home was clean.

Judy Eaker testified that she visited Barbara and Velinda's home when Jasmine was an infant, that the home smelled of cat urine, that dirty clothes were strewn throughout the home, and that Velinda was generally in bed, even in the afternoon. Judy testified that when Barbara lived in Velinda's home, Barbara primarily cared for Jasmine, although she also witnessed Jessica caring for Jasmine. Judy never witnessed Velinda caring for Jasmine. Judy testified that Barbara took good care of Jasmine and that Bart also cared for Jasmine by feeding her and playing with her.

The trial court took judicial notice of the adoption decree and, on September 15, 2004, entered its 18-page order. The trial court reviewed the factors in section 602(a) of the Dissolution Act (750 ILCS 5/602(a) (West 2002)) and determined that it was in Jasmine's best interests to award custody to Barbara. The court held that both parties were mentally and physically capable of having the custody of Jasmine. The court stated that it was concerned with the stability of Velinda's household, considering the major needs of her three older daughters. The trial court awarded Barbara the sole custody of Jasmine, awarded Velinda visitation on alternate weekends, holidays, and four weeks in the summer, and ordered Velinda to pay child support and provide health insurance for Jasmine. On October 14, 2004, Velinda filed her timely notice of appeal.

## ANALYSIS

### Standing

On appeal, Velinda argues that the trial court should have used the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2002)) in determining the parties' standing and Jasmine's best interests, thereby giving Velinda, as Jasmine's blood relative, greater consideration when determining Jasmine's custody. Velinda fails to cite which section of the Adoption Act applied to guide the trial court in awarding the custody of Jasmine. Velinda merely argues that the trial court must apply the Adoption Act because the Dissolution Act cannot apply because it does not recognize same-sex marriages.

A natural parent's superior right to the legal custody of her child is recognized and protected in the Dissolution Act by requiring a nonparent seeking custody to first meet the standing requirements of section 601(b)(2) of the Dissolution Act (750 ILCS 5/601(b)(2) (West 2002)), in order to be considered for custody under the best-interests standard without first establishing the parent's unfitness. *In re Custody of Peterson*, 112 Ill. 2d 48, 53 (1986). The standing requirement for a nonparent, however, is inapposite here. In the present case, Barbara and Velinda consented together to become Jasmine's adoptive parents, and the parental rights of Jasmine's biological parents were terminated. See *In re M.M.*, 156 Ill. 2d 53, 62 (1993) (adoption constitutes a complete and permanent severance of legal and natural rights between biological parents and children, including the right to visitation and custody). As Jasmine's adoptive parents, both Velinda and Barbara had standing under the Dissolution Act to seek the custody of Jasmine. See 750 ILCS 5/601(b)(1)(ii) (West 2002) (a child-custody proceeding is commenced in court by a parent filing a petition for the custody of the child). Velinda's argument that Barbara did not have standing to pursue the custody of Jasmine is without merit.

Further, the statutory factors listed in section 602(a) of the Dissolution Act were relevant in determining Jasmine's custody, despite the fact that Velinda and Barbara were prohibited from marrying under Illinois law. See *Hall v. Hall*, 226 Ill. App. 3d 686, 689 (1991) (regardless of whether parents have ever been married, the statutory factors in the Dissolution Act are relevant to determine a child's custody).

## Custody

Velinda argues that she had a superior right to custody, requiring a higher burden of proof by Barbara, because her biological daughter, Jessica, is Jasmine's biological mother. Velinda argues that the trial court's decision to award the custody of Jasmine to Barbara was therefore against the manifest weight of the evidence.

■ In child-custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court, because in determining the child's best interests the trial court is in a superior position to observe and evaluate the witnesses' demeanor. *In re Marriage of Doty*, 255 Ill. App. 3d 1087, 1097 (1994). Accordingly, we will not reverse the trial court's determination concerning child-custody matters unless it is against the manifest weight of the evidence or a clear abuse of discretion. *In re Marriage of Knoche*, 322 Ill. App. 3d 297, 307 (2001). A trial court's finding is against the manifest weight of the evidence when a finding opposite to that reached by the trial

court is clearly evident. *In re Marriage of Knoche*, 322 Ill. App. 3d at 307. The trial court abuses its discretion when it acts arbitrarily without conscientious judgment or, in view of all the circumstances, exceeds the bounds of reason and ignores recognized principles of law so that substantial injustice results. *In re Marriage of Marsh*, 343 Ill. App. 3d 1235, 1240 (2003).

■ The Dissolution Act requires that the court determine custody in accordance with the best interests of the child, considering all the relevant factors, including: (1) the parents' wishes regarding the child's custody, (2) the child's wishes, if appropriate, (3) the child's interaction and interrelationship with her parents, siblings, and any other person who might significantly affect the child's best interests, (4) the child's adjustment to her home, school, and community, (5) the mental and physical health of all the individuals involved, (6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or another person, (7) the occurrence of ongoing abuse, and (8) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child. 750 ILCS 5/602(a) (West 2002).

In child-custody disputes, there is a presumption that a natural parent's right or interest in the care, custody, and control of his or her child is superior to a third person's claim. *In re Custody of Townsend*, 86 Ill. 2d 502, 508 (1981). However, the presumption is not absolute and is only one of several factors courts use to resolve the controlling question of where the best interests of the child lie. *In re Custody of Townsend*, 86 Ill. 2d at 508.

■ In the present case, the dispute is not between a natural parent and a third party. Jasmine's biological parents' rights to her care, custody, and control were severed. The parties in this custody dispute are Barbara and Velinda, Jasmine's adoptive parents. When considering the factors under the Dissolution Act to determine custody in accordance with Jasmine's best interests (750 ILCS 5/602(a) (West 2002)), we cannot ignore the monumental proceeding that created the child-parent relationship between Jasmine and both Velinda and Barbara. After Jasmine's adoption, Barbara became, for all legal intents and purposes, Jasmine's mother. Although we will not ignore Jasmine's biological connections with the members of Velinda's household, we do not give them undue weight in determining whether Jasmine's best interests are served by placing her with Velinda or with Barbara.

Both Barbara and Velinda prefer to have the custody of Jasmine, and Jasmine is too young to identify a preference. See 750 ILCS 5/602(a)(1), (a)(2) (West 2002).

With regard to Jasmine's interaction and interrelationship with her parents, siblings, and any other person who might significantly affect her best interest (750 ILCS 5/602(a)(3) (West 2002)), we are mindful that Velinda's home houses Jasmine's biological mother, grandmother, and aunts. The evidence demonstrated that Jessica and Jasmine enjoyed a mother-daughter relationship, that Jasmine called Jessica "mommy," and that Jessica cared for Jasmine while Jasmine resided in Velinda's home. The evidence also demonstrated, however, that Velinda's family experienced serious problems as a result of the three eldest daughters' sexual abuse by their father, that Velinda did not provide the primary care for Jasmine, and that although both Barbara's and Velinda's household incomes were sufficient to meet Jasmine's needs, Velinda's household income was less and also had to meet the needs of her other three daughters. See *In re Marriage of Fahy*, 208 Ill. App. 3d 677, 695 (1991) (the parties' relative economic positions must be considered to determine the child's best interests). Barbara's household income exceeded $80,000 per year, Barbara primarily cared for Jasmine when Jasmine visited Barbara, Barbara's flexible work hours allowed her to care for Jasmine during the majority of her visitation, and Barbara's husband Bart and her mother Joanne, both of whom lived in the home with Barbara, also cared for Jasmine. We accept the trial court's credibility determination that Velinda and her daughters' criticisms of Barbara were exaggerated, and we find that the evidence supported the trial court's conclusion that Jasmine's relationships in Barbara's household were nurturing and caring and in Jasmine's best interests.

The evidence demonstrated that Jasmine was well adjusted to both Barbara's home and Velinda's home. See 750 ILCS 5/602(a)(4) (West 2002). With regard to the mental and physical health of the individuals involved (see 750 ILCS 5/602(a)(5) (West 2002)), the evidence demonstrated that Jasmine suffered from diaper rash as a reaction to an antibiotic, that Jessica, in Velinda's home, believed that Jasmine did not require much sleep, and that Jasmine suffered from a breathing disorder, which would be exacerbated by smoke inhalation, although Barbara testified that she and Bart did not smoke in Jasmine's presence or in their home. Barbara testified that she no longer suffered from leukemia and was generally in good health. The evidence demonstrated that members of Velinda's household suffered sexual abuse by their father and that Anna suffered from depression, self-mutilation, and suicide ideation. The evidence supported the trial court's finding that both Barbara and Velinda were mentally and physically capable of having custody of Jasmine. The evidence also supported the trial court's concern about the mental health issues and the stability of Velinda's household.

The evidence supported the trial court's determinations that neither party was physically threatening (see 750 ILCS 5/602(a)(6) (West 2002)) and that there was no ongoing domestic abuse (see 750 ILCS 5/602(a)(7) (West 2002)). Both Barbara and Velinda facilitated the other's relationship with Jasmine before the hearing, pursuant to the court-ordered visitation schedule, and the evidence did not indicate that either party would fail to encourage the other's relationship with Jasmine. See 750 ILCS 5/602(a)(8) (West 2002).

After considering the evidence in light of the relevant factors to determine Jasmine's best interests, we conclude that the trial court properly awarded the custody of Jasmine to Barbara.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

KUEHN and CHAPMAN, JJ., concur.