2024 IL App (1st) 232374

No. 1-23-2374

Opinion filed August 26, 2024

FIRST DIVISION

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| IN THE INTEREST OF A.C., | ) | Appeal from the |
| | ) | Circuit Court of |
| Minor/Respondent-Appellee | ) | Cook County |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | No. 22 JA 323 |
| Petitioner-Appellee, | ) | |
| v. | ) | |
| | ) | |
| C.R., | ) | The Honorable |
| | ) | Levander Smith, Jr., |
| Mother/Respondent-Appellant). | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1    Mother/respondent-appellant C.R. (respondent) appeals following orders entered by the trial court finding minor/respondent-appellee A.C. (A.C.) neglected based on injurious environment and abused based on substantial risk of physical injury and sexual abuse, and finding respondent unable to care for, protect, discipline or train A.C., thus, removing A.C. from her custody. Respondent does not challenge the findings that A.C. was abused or neglected, nor that she (respondent) "could be named the perpetrator of or inflicted neglect or abuse/substantial

risk of injury." Instead, her only contention on appeal is that the trial court erred in entering a finding that she had "inflicted" sexual abuse, as she did not physically commit sexual abuse against A.C. but, rather, A.C.'s father did. Appellee briefs have been filed by the State and by the Cook County Public Guardian on behalf of A.C. For the following reasons, we affirm.

¶ 2                                     BACKGROUND

¶ 3        A.C. is a girl who was born on July 16, 2015 to her biological parents: mother, who is respondent here, and father, Ab. C. (father). While both respondent and father were involved in the proceedings below, father is not a party to this appeal.[1]

¶ 4        In May 2022, the State filed a petition for adjudication of wardship and a motion for temporary custody of A.C. The petition alleged A.C. made an outcry on March 30, 2022 that her father sexually abused her, that respondent knew of a prior outcry A.C. made of father doing the same back in 2018 yet continued to allow father to have unsupervised visits with A.C., and that there was ongoing domestic violence between respondent and father. Accordingly, the State sought findings of neglect based on injurious environment and abuse based on a substantial risk of physical injury and sexual abuse.

¶ 5        The matter proceeded to an adjudication hearing.[2] Briefly, detective Lisa David of the Chicago Police Department, who was assigned to A.C.'s case, testified that she interviewed respondent. Respondent recounted to detective David that she began a relationship with father in

---

[1] For the record, respondent and father, to whom the trial court's determinations of neglect and abuse both applied, filed separate appeals in this matter, via different attorneys. Initially, those appeals were consolidated, but this Court later unconsolidated them and the appeals proceeded separately. Father's appeal was recently disposed of via summary order, wherein we granted his counsel's motion for leave to withdraw as appointed counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967), and affirmed the judgment of the trial court as against him after finding no issue of arguable merit. See *In re A.C.*, 2024 IL App (1st) 232448-U (order issued on May 13, 2024).

[2] As the facts herein are predominantly uncontested, and because respondent does not challenge the findings of neglect and abuse, we present only those facts relevant to this appeal.

2014. Initially, the relationship was good, but it deteriorated when they would often drink together, leading to domestic violence, with father "constantly putting his hands" on her and choking her, including while she was pregnant with A.C. Because of this, in 2018, respondent took A.C. and moved to Florida. However, respondent traveled back to Chicago every other month so A.C. could spend time with father. Respondent explained she thought she was under an Illinois court order, obtained by father, requiring her to bring A.C. to him for visits; yet, no such order was ever produced.

¶ 6        Detective David further testified respondent told her that, while living in Florida, A.C., who was approximately four years old, told respondent father touched her private parts. Respondent checked A.C.'s vaginal area and noticed it appeared red and irritated. She contacted father, who told her that during one of their visits, he had applied ointment to A.C. because she had a rash. Knowing that A.C. never got rashes, respondent took A.C. to a hospital in Florida. She recounted that although the hospital did not notice anything unusual, a child protection case was opened. She told detective David that apart from a case worker asking A.C. some questions, nothing resulted from this.

¶ 7        Respondent further stated during the interview that she left Florida and returned to Chicago in 2019, moving into her own apartment with A.C. About a year later, however, she rekindled her relationship with father, who began spending every night at her apartment and, once she started working, cared for A.C. On March 30, 2022, respondent and A.C., who was now six years old, were lying in bed when A.C. began thrusting her private parts against respondent, saying, "that's what her daddy does." A.C. went on to describe to respondent that father pulls her hair, puts his private part in her mouth, licks her private parts often, grabs her when she tells him to stop, puts his private part on hers while moving his hands back and forth, and that he

"peed" in her mouth and it was "slimy." A.C. told respondent father did this while respondent was at work, as well as twice during Christmas (December 2021). Respondent took A.C. to the hospital and then texted father saying she "wanted nothing to do with him" anymore. That was her last communication with him.

¶ 8        Coty Corcoles, an investigator for the Department of Children and Family Services (DCFS), also testified at the adjudication hearing. She interviewed A.C., respondent, and father on March 31, 2022, the day after A.C.'s (second) outcry. With respect to A.C., Corcoles noted she was engaged and happy at the start of the interview, but her demeanor changed to being quiet and not answering questions once Corcoles asked her if anyone touched her private parts. During respondent's interview, respondent told Corcoles about the prior report in Florida, but said she did not know what happened with it. She described to Corcoles that the recent outcry arose when A.C. began thrusting on her and that, during this time, A.C. was staying with father about four or five nights out of the week while she worked. Respondent further admitted that there was a history of domestic violence between her and father. During father's interview, he told Corcoles that any domestic violence was simply respondent always arguing and fighting with him. He denied all allegations as to A.C. and claimed that respondent would send texts to him saying she was going to harm herself and call the police. He also told Corcoles that he initiated a domestic relations case in Skokie to get A.C. brought back from Florida to Chicago; however, father never showed Corcoles a court order mandating A.C.'s return.

¶ 9        Later, in early May 2022, Corcoles was subsequently assigned to investigate allegations that respondent had been aware of A.C.'s sexual abuse but did not do anything to protect her. As part of this investigation, she again interviewed respondent, who again told Corcoles that A.C. made an outcry that father touched her inappropriately while A.C. and respondent were living in

Florida in 2018-19. She explained to Corcoles that she took A.C. to a Florida hospital and an investigation was opened, but she did not know the outcome of it. Respondent told Corcoles that she kept returning to Chicago because father "put in an order so he could see" A.C., *i.e.*, it appeared to Corcoles that respondent believed she had to make A.C. available to father because she believed he had obtained a court order for visitation. However, respondent never produced such an order to show Corcoles and Corcoles never found a court order during her investigation. During subsequent interviews, respondent recounted the domestic violence between her and father, stating A.C. was usually not present, except for once when she was sleeping while they were fighting. Respondent told Corcoles that she called the police about the physical abuse, but otherwise never pursued it; Corcoles never saw a police report. Respondent also told Corcoles that A.C. told her the sexual abuse happened some 15 times, usually in father's room but sometimes in the living room. Following these interviews, Corcoles took protective custody of A.C., indicated father in the March 2022 investigation for sexual penetration and substantial risk, and indicated respondent in the May 2022 investigation for sexual penetration.

¶ 10     Rosemary Najarro, a forensic interviewer for the Chicago Children's Advocacy Center (CCAC), testified at the adjudication hearing that she completed a Victim Sensitive Interview with A.C. in early May 2022. Similar to Corcoles' testimony, Najarro stated that when asked general questions during the interview, A.C. was engaged and responsive; this changed, however, when father was discussed, during which time A.C. took longer to answer questions and became fidgety and uncomfortable. Eventually, A.C. described the same incidents of sexual abuse to Najarro as she had to respondent, including that he would put and move, and she could feel, his finger in her vagina and anus. A.C. described that all this happened more than once, took place when no one else was at home, and occurred when respondent was at work.

¶ 11    Various hospital and medical records regarding A.C. were introduced into evidence, showing respondent brought A.C. to an emergency room on March 30, 2022 after observing her abnormal behavior and hearing her outcry; A.C. was later transferred to Lurie Children's Hospital. The records detail that respondent reported, in a consistent manner, the same instances of abuse she discussed with detective David, Corcoles and Najarro regarding A.C., including A.C.'s prior outcry in Florida. Respondent stated that nothing happened with social services in Florida and the investigation there did not prohibit visitation between A.C. and father. The records also note respondent's discussion of domestic violence against her by father, which was ongoing and with the most recent incident happening two months before A.C.'s March 2022 outcry. Respondent stated she filed a police report but did not obtain an order of protection, and she reunited with father several weeks later, allowing him to resume spending nights at her home. Finally, hospital records show A.C. underwent a physical exam, including photographs and a sexual assault evidence collection kit; she was diagnosed with "sexual assault of child" and her medical records stated that there was "Child sexual abuse, confirmed."

¶ 12    At the close of the adjudication hearing, the State reiterated the evidence for the trial court and asked that both respondent and father be named perpetrators of each finding of neglect based on injurious environment, abuse based on a substantial risk of injury, and abuse based on sexual abuse. With respect to the last of these, the State argued that while A.C. alleged father to have committed the physical acts of sexual abuse, respondent's decisions to allow father to care for and be around A.C. despite her knowledge of prior sexual abuse supported a finding that she, too, be named a perpetrator. The Assistant Public Guardian similarly asked the court to enter findings of neglect based on injurious environment, abuse based on a substantial risk of injury, and abuse based on sexual abuse; it only asked that father be named as the perpetrator. For her

part, respondent argued she should not be found to be the perpetrator of either sexual abuse or abuse based on substantial risk of injury because she believed she had to return A.C. to father for visits and because she cooperated with the investigations. Father asked that no finding of abuse be made, insisting there was no corroboration of A.C.'s statements.

¶ 13    The trial court issued findings under the Juvenile Court Act (Act) of neglect based on injurious environment (section 2-3(1)(b)), abuse based on substantial risk of physical injury (section 2-3(2)(ii)), and abuse based on sexual abuse (section 2-3(2)(iii)), "[a]ll as having been inflicted by both parents." See 705 ILCS 405/2-3(1)(b), 2-3(2)(ii), 2-3(2)(iii) (West 2022). During a lengthy colloquy, the court found the State's witnesses to be credible and discussed the evidence at length, including the interviews, hospital records, and consistency and details of A.C.'s statements. With respect to respondent and the finding against her of sexual abuse, the court found "that the mother knew about the sexual abuse but continued to allow [A.C.] to have unsupervised contact with the father repeatedly even with that knowledge." It noted that while there was some evidence father had initiated a domestic relations case in another court, there was never any evidence of a court order commanding respondent to return to Chicago and mandating visitation between A.C. and father. The court commended respondent on her honesty, particularly regarding the domestic violence she suffered, but stated that the evidence, including her reunion with father and her love for him (professed via text messages), showed she came back to Chicago "because she wanted to." Ultimately, in its written order, the court stated that "Minor disclosed sexual abuse to the mother by the father. Afterwards, mother continued to allow contact" and, therefore, its findings that A.C. suffered abuse and neglect "inflicted by a parent" applied to both "[m]other and father" as to all three grounds.

¶ 14        The court then held a disposition hearing.  Briefly,[3] evidence presented at this hearing included an Integrated Assessment (IA), which recommended no contact between father and A.C.  It also disclosed that respondent had been sexually assaulted and experienced domestic violence when she was young.  The IA recommended individual therapy for respondent focusing on her role in protecting A.C., domestic violence services, and parenting education, all to be substantially completed before reunification could be contemplated.  Under the "Prognosis" section, the IA stated that reunification between A.C. and respondent at this time "is poor," as respondent "continued to allow unsupervised time between" A.C. and father even after bringing A.C. to a doctor following her first outcry, and "did not appear to make a safety plan to minimize their unsupervised contact * * * thereby placing [A.C.]'s safety at risk."  Kimberly Graham, A.C.'s caseworker, testified during the hearing that A.C. was living with her foster mother, who is also her maternal grandmother, in a safe and appropriate home.  A.C. had been receiving therapy, but had paused as her therapist left the agency; she would be reenrolled soon.  Graham noted that father had been referred for a sexual abuse evaluation, but he refused to participate; he had not started any recommended services.  With respect to respondent, Graham averred that she had completed a parenting class and a substance abuse assessment, but still needed to complete individual therapy as ordered in the IA; respondent was willing to do so but was experiencing scheduling problems due to her involvement in other services.  Graham acknowledged that respondent visited A.C. in her foster home several days a week, but those visits had yet to be observed by her agency.

¶ 15        At the close of the disposition hearing, the trial court adjudged A.C. a ward of the court, found respondent and father both unable for some reason other than financial circumstances

---

[3] Again, respondent does not challenge the dispositional findings or order of the trial court.

alone to care for, protect, train, or discipline her, and deemed it in A.C.'s best interest to be removed from their custody.[4] With respect to respondent, the court noted that she has been visiting A.C. via supervised visits three or four days a week, which was "a good thing," and that, once these were observed and evaluated by the agency, unsupervised visits might be a possibility, as she "has made some progress" and has completed some services. However, the court found that respondent's progress was "[n]ot substantial yet" because there "are a number of other services" that "have not been completed," including individual therapy and domestic violence services, which the court deemed "crucial" in this case. Ultimately, the court set the goal of A.C.'s return home to respondent within 12 months.

¶ 16                                    ANALYSIS

¶ 17        We begin by noting, again, that respondent does not challenge the trial court's findings that A.C. was abused and neglected, or that the court could have named, and did so name, her as the perpetrator of, or one who inflicted, the neglect due to injurious environment and the abuse due to substantial risk/physical injury, as it did pursuant to sections 2-3(1)(b) and 2-3(2)(ii) of the Act. Nor does she challenge the finding that father sexual abused A.C. Rather, respondent's sole contention is that the trial court erred in entering a finding that she had "inflicted" sexual abuse, pursuant to section 2-3(2)(iii) of the Act (*i.e.*, its third finding). She insists that, as she did not physically commit sexual abuse against A.C., only father could have been cited by the court as having inflicted this and, thus, this particular portion of the court's finding should not be upheld as to her. She goes on to further assert that this finding does nothing to "confer additional protection on" A.C. who has already been adjudicated abused and neglected on the other

_____

[4] For the record, the court issued an additional finding of "unfit" as against father (only) and ordered no visitation between him and A.C.

grounds, and that she did not condone or participate in the abuse but, instead, was "sincere, forthcoming and cooperative" in the ensuing investigations, obtained help for A.C., and ended her relationship with father.

¶ 18        On this latter point, we commend respondent for listening to A.C.'s (second) outcry and taking action that brought her before people who have finally assisted in keeping her safe and getting her the help she desperately needs. This Court has had the misfortune of seeing, over and over again, similar situations that end up much worse than what has happened here due to a parent who refuses to accept the truth. Regrettably, however, that is of little consolation, we would imagine, to A.C. Yes, the evidence indicates that respondent did not personally abuse A.C. sexually. Regardless, that she took some positive steps toward protecting her child from her sexual abuser almost four years after that child first told her—clearly, unmistakably, and in detail—what was happening, all the while repeatedly choosing to leave her with that abuser four to five nights every week, provides no basis in the law that would somehow immunize or excuse her, as she now claims, from the trial court's finding that she inflicted sexual abuse.

¶ 19        As a threshold matter, the parties dispute the applicable standard of review. Respondent insists it must be *de novo* because the issue presented, namely, whether she can be said to have "inflicted" the sexual abuse, relies on statutory construction involving provisions of the Act. The Public Guardian and the State disagree, noting that this is not purely a legal question but, rather, one involving the facts presented regarding respondent's knowledge and actions and, thus, review should be conducted via abuse of discretion or, perhaps, manifest weight of the evidence. We understand both angles here.

¶ 20        In *In re J.B.*, 332 Ill. App. 3d 316, 320 (2002), this Court was asked, just as in the instant cause, to review whether a trial court had correctly named a respondent as the perpetrator of

sexual abuse against a minor. In *In re A.M.*, 296 Ill. App. 3d 752, 754 (1998), we were asked to review a trial court's decision that refused to make a specific finding naming the perpetrator of sexual abuse against a minor. In both instances, we did so by employing an abuse of discretion standard. See *J.B.*, 332 Ill. App. 3d at 320-21 (holding "the trial court did not abuse its discretion when it named the respondent (the mother's paramour) as the perpetrator [of] the sexual abuse in J.B.'s case"); *A.M.*, 296 Ill. App. 3d at 754 ("a trial court's decision as to whether certain findings should be made is within the court's sound discretion and will be altered only upon a showing that the court abused its discretion"). We find no reason to depart from these cases, as we are also reminded of the long-standing and inherent principle that there is a "strong and compelling presumption in favor of the result reached by the trial court" in child custody cases. *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 323 (2005); see also *In re Jeh. R.*, 2023 IL App (1st) 230006, ¶ 59 (abuse and neglect findings are *sui generis*, based on the totality of the evidence presented in each particular case, and great deference is afforded to the trial court with respect to these findings). Ultimately, however, even were this not so, our decision in the instant cause would be the same under any of the standards of review proposed.

¶ 21      Section 2-3(2) of the Juvenile Court Act (Act) states, in relevant part, that abused minors "include any minor under 18 years of age * * * whose parent * * *

> (iii) commits *or allows to be committed* any sex offense against such minor
>
> * * *" (emphasis added).

705 ILCS 405/2-3(2)(iii) (West 2022). The Act does not specifically define "commits" or "allows to be committed." See 705 ILCS 405/1-3 (West 2022). But, the meaning of these common words is apparent. "Commit" is defined as "to carry into action deliberately: perpetrate," while "allow" is defined as to "permit" and, more specifically, "to fail to restrain or

prevent." See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/ dictionary/commit, https://www.merriam-webster.com/dictionary/allow (last visited Aug. 19, 2024); see also *Watson v. Legacy Healthcare Financial Services, LLC*, 2021 IL App (1st) 210279, ¶¶ 9, 56 (quoting *Maschek v. City of Chicago*, 2015 IL App (1st) 150520) (" 'When a statute does not define its own terms, a reviewing court may use a dictionary to ascertain the plain and ordinary meaning of those terms,' " and our supreme court has turned first to Merriam-Webster's Dictionary); accord *Metropolitan Life Ins. Co. v. Hamer*, 2013 IL 114234 (it is appropriate to employ a dictionary to ascertain the meaning of an otherwise undefined word or phrase in a statute).

¶ 22    Taking these common definitions and applying them to the statute at issue, it is clear, in direct contradiction to respondent's main argument, that a parent can be found under section 2-3(2)(iii) of the Act to have inflicted sexual abuse of her child even if she did not physically inflict that abuse herself but, instead, where she permitted it to be perpetrated, that is, where she failed to prevent it from happening. And, that is exactly what the trial court found here.

¶ 23    The evidence demonstrated that A.C. was sexually abused by father. Respondent does not challenge this evidence, or finding, in any way. Moreover, the evidence presented at the adjudication and disposition hearings readily showed, without a doubt, that respondent knew father was sexually abusing A.C. as early as 2018, when she was approximately four years old. Again, respondent does not challenge this either. Detective David, DCFS investigator Corcoles, and CCAC forensic interviewer Najarro all testified, in corroboration, that respondent told each of them in their separate interviews of her that A.C. told her in 2018, while they were living in Florida, father had touched her private parts. Respondent acknowledged that during their time in Florida, she brought A.C. back to Chicago at least every other month to have visits with father.

She also admitted that, at the time of this first outcry, she saw A.C.'s vaginal area was red and irritated, she questioned father about this, and she did not believe father's explanation that he had applied ointment to A.C. for a rash during one of their visits. Respondent took A.C. to a Florida hospital for examination, which resulted in a child protection investigation being opened there. However, respondent did not follow up on that investigation and did not know what happened with it. Instead, she chose to continue returning A.C. to Chicago for visits with father, ultimately moving back with her. Once back, she then chose to rekindle her romantic relationship with father. Now, not only was father visiting with A.C., he was, with respondent's permission, spending every night at the apartment A.C. shared with respondent. Then, subsequently, respondent put A.C. in his sole and direct care four to five nights a week while she went to work. This continued, per respondent, from 2019 until March 2022, when A.C. made her second outcry to her that father was sexually abusing her, with that outcry taking place during the incident where A.C. began thrusting her private parts against respondent while they were in bed.

¶ 24     We find no error with the trial court's holding that A.C.'s sexual abuse finding based on section 2-3(2)(iii) of the Act was the result of abuse inflicted by both parents and, thus, applied to respondent just as much as to father. As the court commented during its colloquy following the adjudication hearing, it found the State's witnesses to be credible and it discussed the evidence they provided, as well as A.C.'s hospital and medical records, at length, noting the specificity and consistency of A.C.'s statements. In particular, the court stated, with respect to respondent, that its decision to adjudge A.C. abused based on sexual abuse as the result of abuse inflicted by her was supported by the evidence which demonstrated she "knew about the sexual abuse but continued to allow [A.C.] to have unsupervised contact with the father repeatedly even with that knowledge." While the court praised respondent for her honesty, especially regarding

the domestic violence she suffered at the hands of father, this did not, in the court's view, negate the fact that that she reunified with father and allowed contact between him and A.C., repeatedly and unsupervised, for the next few years—all after A.C. had disclosed to her in 2018 that father had sexually abused her, respondent had suspicions of this, and an investigation had been opened. The court went on to note that these were actions respondent chose of her own accord, based on her professed love for father, and ultimately, "because she wanted to." So, while the court adjudged A.C. abused based on sexual abuse as to father under section 2-3(2)(iii) because he actually, physically, "commit[ted]" a sex offense against A.C., it adjudge A.C. abused based on sexual abuse as to respondent under the same section's provision that she, as her mother, "allow[ed] to be committed" a sex offense against A.C.—namely, permitting father and/or failing to prevent father from committing sexual offenses against A.C. which she admittedly knew were taking, and had taken, place. As respondent presents nothing in the record to rebut the evidence presented, we find no reason to reverse. See *Jeh. R.*, 2023 IL App (1st) 230006, ¶ 59; *Connor*, 356 Ill. App. 3d at 323.

¶ 25    Our decision here is in line with others of this Court which, while perhaps not procedurally on point, have likewise declared that a parent may well be deemed a perpetrator of abuse even if she was not the particular person who actually committed the physical or sexual act upon the child that formed the basis of the abuse finding. For example, *In re Carlenn H.* differs procedurally from the instant cause in that the trial court adjudged the minor therein abused based on injurious environment; however, the court's finding for that basis was that the respondent-mother had allowed sexual abuse of the minor, in violation of a prior, yet very similar, version of section 2-3(2)(iii) of the Act. See 186 Ill. App. 3d 535, 539 (1989) (involving Ill. Rev. Stat. 1985, ch. 37, par. 702-4(2)(a)(iii), a precursor to the current section at issue, which

likewise stated a sexually abused minor is one "whose parent * * * allows to be committed any sex offense against such minor"). On appeal, we flatly rejected the respondent-mother's specific claim that the trial court's adjudication must be reversed as to her because it was based on evidence relating to incidents of sexual abuse that she, physically, did not commit upon the minor. See *Carlenn H.*, 186 Ill. App. 3d at 540. Instead, the evidence showed, just as in the instant case, that the minor had made multiple outcries to the respondent-mother detailing instances of the mother's live-in boyfriend subjecting her to various sexual acts, yet the mother continued to allow her boyfriend to live with them. See *Carlenn H.*, 186 Ill. App. 3d at 537-38. We concluded that the respondent-mother's knowledge of the sexual abuse and her allowance of its continuation by the boyfriend was amply sufficient to uphold the trial court's adjudication as against her. See *Carlenn H.*, 186 Ill. App. 3d at 539-40.

¶ 26    Similarly, in *In re Walter B.*, 227 Ill. App. 3d 746 (1992), a petition for adjudication of wardship alleged, among other things, sexual abuse of the minor, following the minor's repeated outcries, including to his mother. While it is not clear whether the allegations of sexual abuse were alleged against both the mother and the father in the filed petition, the evidence presented, which included interviews of the parents by law enforcement personnel and case workers corroborating the minor's outcries, showed that the minor's father committed various sexual acts against him and that the minor's mother personally witnessed several of these but did nothing in response. See *Walter B.*, 227 Ill. App. 3d at 748-50. On appeal from a trial court's dismissal of the petition, we reversed and remanded, concluding the court's findings of unproved charges, including those centering on sexual abuse, were wholly against the manifest weight of the evidence. Specifically with respect to the mother, we noted that sections of the Wrongs to Children Act in effect at that time "made it unlawful 'for any person having the care or custody

of a child, wilfully to cause *or permit* the life of such child to be endangered * * *,' or for a parent or stepparent to '*knowingly allow[] or permit[]* an act of criminal sexual abuse or criminal sexual assault * * * upon his or her child and fail[] to take reasonable steps to prevent its commission or future occurrences of such acts * * * (emphasis in original).' " *Walter B.*, 227 Ill. App. 3d at 752-53 (quoting Ill. Rev. Stat. 1989, ch. 23, pars. 2354, 2355.1). As the mother had made voluntary statements to police and caseworkers that she knew of and permitted the acts of sexual abuse by the father upon the minor, these were more than sufficient to show she "permitted acts of criminal sexual abuse upon her child in contravention of the forgoing protective statutes," which should have been substantively considered by the trial court. *Walter B.*, 227 Ill. App. 3d at 752-53 ("Parents are not free to stand by as disinterested witnesses when such deleterious events materialize. It was the mother's obligation, both morally and legally, to intervene on Walter's behalf"). See also *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶¶ 65-66, 74 (affirming finding of abuse as against mother and father pursuant to section 2-3(2)(i) of the Act, even though the evidence indicated someone other than they actually caused the physical acts leading to the minor's injuries, as the Act specifies that abuse occurs if the minor's parent "inflicts * * * or *allows to be inflicted* upon such minor physical injury, by other than accidental means" (emphasis in original)).

¶ 27    Accordingly, and based on all this, we find no error in the trial court's determination that A.C.'s sexual abuse finding under section 2-3(2)(iii) of the Act could apply to respondent.

¶ 28    Rather than section 2-3-(2)(iii) of Act which was the basis of the trial court's finding of abuse based on sexual abuse of A.C., respondent focuses on an interplay she raises between the words "inflict" and "perpetrator," the former which is used in the preprinted adjudication form order used by trial courts in matters involving neglected and abused minors such as the instant

cause, and the latter which the parties used throughout the proceedings here. In her view, she insists we must look to section 2-21 of the Act, which deals with "Findings and Adjudication," and that we must view subsection (1) of that section, which refers to a court having to report its determination if it "determines that a person has inflicted physical or sexual abuse upon a minor" (705 ILCS 405/2-21(1) (West 2022)). From this, she claims "inflict" requires an apportionment that, again, cannot be applied as to her since she did not actually physically abuse A.C. sexually.

¶ 29     We do not accept respondent's assertion in the slightest. First, and foremost, the actual language of section 2-21 of the Act is not the focus of this cause. Rather, as we have discussed at length, section 2-3(2)(iii) is, as it is the direct, explicit finding of the trial court as the ground (one of three) of A.C.'s abuse. Section 2-21 could, in essence, be called administrative here—as demonstrated in the record before us, it is the statutory section listed in parenthesis under the words "ADJUDICATION ORDER" at the top of the preprinted form filled out by the trial court following A.C.'s adjudication hearing, the same form all such courts use. This section of the Act describes that it allows the court to issue its adjudication finding after examining notice, service of process and the holding of a hearing; it also states what should and should not appear in the court's written adjudication order. See 705 ILCS 405/2-21 (West 2022). However, the section 2-21 adjudication order form also asks the trial court to indicate under which specific section of the Act, "as defined in 405/2-3 of the * * * Act," the conduct at issue has resulted in the court's neglect or abuse finding. The court is to do so by checking any number of boxes provided next to various sections of the Act that detail different types and/or factors of neglect or abuse. Thus, while section 2-21 gets us to an adjudication hearing and subsequent order, the court must check the appropriate statutory box(es) indicating the specific statutory provision(s) under which it has concluded neglect or abuse has taken place. In the instant adjudication matter, contrary to

respondent's insistence, the focus is not on section 2-21, then, but, rather, and more specifically, on "405/2-3(2)(iii) sexual abuse," which the trial court checked off as a ground of abuse it found took place upon A.C., and for which it then explained its basis in the blank form lines provided as: "Minor disclosed sexual abuse to the mother by the father. Afterwards, mother continued to allow contact."

¶ 30      Moreover, there is no merit to any assertion respondent makes with respect to the words "inflict" and "perpetrator." As even she notes, "perpetrator" is not used in the section 2-21 preprinted adjudication order form or anywhere in the relevant portion of the Act in this cause. "Inflicted" is on the preprinted form; yet, we do not see how this supports respondent's claim.[5] On the form, after the trial court checks the box(es) denoting which section(s) of the Act underlie the bases of its neglect and abuse finding, it is to then check either a box that states the type of neglect or abuse found "is not the result of abuse or neglect inflicted by a parent, guardian, or legal custodian of the minor **-OR-** is the result of abuse or neglect inflicted by a:" and is to select from separate boxes for parent, guardian, or legal custodian (emphasis in original). Just as with "commit" and "allow," "inflict" is not defined by the statute. Thus, as we properly did earlier herein, we turn to its common definition, which is "to cause (something unpleasant) to be endured." See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/inflict (last visited Aug. 19, 2024); *Watson*, 2021 IL App (1st) 210279, ¶¶ 9, 56; *Metropolitan Life*, 2013 IL 114234. Additionally, we note that "inflicted" is also used in section 2-3(2)(i) of the Act, which precedes section 2-3(2)(iii) at issue, to state that a child is physically abused if a parent "inflicts, causes to be inflicted, *or allows to be inflicted* upon such minor

---

[5] This is also true considering "inflicted" is used with respect to the other two grounds of neglect and abuse found against respondent; yet, she does not challenge those on appeal at all.

physical injury, by other than accidental means (emphasis added)." 705 ILCS 405/2-3(2)(i) (West 2022). This is incredibly similar to the language of section 2-3(2)(iii) and, just like it, indicates that a parent can be held to have neglected or abused her child if she has actually done the act that resulted in the neglect or abuse finding *or allows* it to happen. Thus, and without more, we fail to find respondent's word-play persuasive to support her claims.

¶ 31    Finally, respondent's insistence that section 2-21 does not require a trial court to name a specific perpetrator is also of little support. She is correct; section 2-21 adjudication findings do not necessarily require a court to name a specific perpetrator of abuse. See, *e.g.*, *Chelsea H.*, 2016 IL App (1st) 150560, ¶ 65 (all that is required is a finding that a parent allowed the injuries to occur and, so, who committed the alleged abuse is not the focus of the adjudication hearing but, rather, the focus is on whether the minor was abused). However, subsection (1) of section 2-21 goes on to state that if the court finds the minor was abused or neglected, it "shall then determine and put in writing the factual basis supporting that determination, and specify, to the extent possible, the acts or omission or both of each parent * * * that form the basis of the court's findings. That finding shall appear in the order of the court." 705 ILCS 405/2-21(1) (West 2022). As we have already discussed at length, that is exactly what the trial court in the instant case did—attributing with detail and specificity what actions and omissions forming the bases of its neglect and abuse findings it attributed, in light of the evidence presented, to father (committing the sexual abuse) and to respondent (allowing it to be committed).

¶ 32    We understand that the instant cause is a delicate one, as is being named the perpetrator of sexual abuse. We also note that, while the IA found it to be "poor," the trial court did have a positive outlook when it came to the possibility of eventual reunification sometime in the future between A.C. and respondent, who has shown a willingness to participate in services. However,

none of that discounts the principles involved here; the plain, ordinary, and common-sense meanings of the words of section 2-3(2)(iii) of the Act; and, ultimately, the propriety of the trial court's decision.

¶ 33                                    CONCLUSION

¶ 34        Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

¶ 35        Affirmed.